Ronald ALMAN, etc.,
Plaintiff, Appellee,

v.

Jerome DANIN, et al.,
Defendants, Appellants.

No. 85–2027.

United States Court of Appeals,
First Circuit.

Sept. 8, 1986.

Anthony M. Fredella and Fredella & Wheeler on brief for defendants, appellants.

John McMahon and Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C. on brief for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Defendants Jerome Danin, Frank Fredella, and Vi-Mil, Inc., appeal from a district court decision holding them jointly and sev-

erally liable for the unpaid contributions owed by Mohawk Manufacturing Company (Mohawk) to its employee benefit plans. We affirm the district court's decision.

## I.

In 1975, Danin and Fredella formed Vi-Mil, Inc., a corporation that manufactures primarily raincoats for military branches under the Department of Defense.[1] Ever since the company's inception, Danin and Fredella have been its only shareholders, each owning half the outstanding stock. They are the sole members of its board of directors.

As apparently often occurs with government clothing contracts, the government provides Vi-Mil with the basic material from which the garment is to be cut. Vi-Mil, however, does not have extensive sewing facilities in house; thus, after cutting the cloth into the component pieces of the garment, the company must send the pieces, as well as any lining and trim, to another shop to be sewn together. Prior to 1979, most if not all of the sewing necessary to complete raincoats was performed by B & S Manufacturing Company in Orange, Massachusetts.

B & S ceased operations in 1979, thereby depriving Vi-Mil of its primary means of sewing garments. In response, Danin and Fredella, as individuals, purchased the B & S plant and all the equipment within it.

Shortly thereafter, Danin and Fredella created Mohawk, dividing the shares of the new corporation equally between themselves. Fredella assumed the positions of president, clerk and a director; Danin became treasurer and a director. No other person was elected to the board or appointed as an officer.

After its creation, Mohawk moved into the old B & S Orange, Massachusetts plant and picked up where B & S left off, performing the sewing tasks Vi-Mil needed to complete its government contracts. Unlike B & S, however, Mohawk neither owned the plant or the machinery nor did work for any other entity but Vi-Mil.[2] Indeed, Danin, Fredella, and Vi-Mil on the one hand and Mohawk on the other had such a close relationship that several unusual business practices arose. For example, the record contains no evidence that Danin and Fredella ever charged Mohawk rent for its use of the plant or the machinery therein. Moreover, Vi-Mil loaned Mohawk about twelve sewing machines and other pieces of equipment, requiring no documentation of the loan nor, apparently, imposing any fee. Although by no means exhaustive, these examples indicate the informality and closeness of the relations between defendants and Mohawk.

On July 14, 1980, Mohawk, represented by Danin, entered into a memorandum of

1. This description of the factual setting is based on the findings of the district court, which had before it only depositions and documentary exhibits. Except where otherwise noted, appellant concedes the accuracy of these findings.

2. Appellant objects that the record contains no evidence in support of these conclusions. We find that in each instance the district court drew permissible inferences from the exhibits and deposition testimony presented. For example, the September 21, 1984 deposition of Frank Fredella provides sufficient support for the district court's determination that Mohawk never acquired title to the Orange, Massachusetts plant:

    Q: Do you recall executing any document by which your interest in the property at 110 East Main Street[, Orange, Massachusetts] was transferred to Mohawk Manufacturing Company?

A: I don't recall specifically, no. I don't recall. That's all I can say.

Given Fredella's position as an officer of Mohawk and as half owner of the plant, his inability to recall or to produce such a document permits a reasonable inference that none was ever executed. The district court's conclusion that no transfer was made is not "clearly erroneous", the standard of review we apply in this case. See Fed.R.Civ.P. 52(a); *United States v. Gypsum Co.,* 333 U.S. 364, 394–95, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Holmes v. Bateson,* 583 F.2d 542, 552 (1st Cir.1978).

Similarly, Jerome Danin's September 24, 1984 deposition included the following passage:

    Q: Did Mohawk Manufacturing Company do any work for any business other than Vi-Mil?
    A: Not that I recall.

Again, the district court was entitled to conclude that if Danin did not know of any non-Vi-Mil manufacturing work then none existed.

agreement with Local 226 of the International Ladies' Garment Workers' Union (the Union). In April of 1981, Mohawk (again represented by Danin) and the union expanded the agreement into a comprehensive collective bargaining contract, the terms of which were made effective retroactive to July 1980. The contract, among other things, called for Mohawk to make weekly contributions to various union-operated employee benefit funds. When Mohawk failed to do so, the Union brought suit in federal district court pursuant to the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* (1982), seeking enforcement of the contractual provisions. After the case was referred to arbitration and returned to federal court, the district judge entered judgment against Mohawk for $97,372, the total unpaid contributions that had accrued during the life of the collective bargaining contract. *Alman v. Mohawk Manufacturing Co.*, No. 81–0239–F (D.Mass.1983).

The Union, later discovering that Mohawk was defunct and assetless, sued Vi-Mil, Danin, and Fredella for recovery of the judgment. The District Court for the District of Massachusetts concluded that (1) Vi-Mil and Mohawk were run as a single, integrated enterprise, and (2) Danin and Fredella showed so little respect for Mohawk's corporate form that it was appropriate to "pierce the corporate veil." Accordingly, the court held Danin, Fredella, and Vi-Mil jointly and severally liable for the full amount of Mohawk's unpaid contributions, plus interest, costs and attorneys' fees.

On appeal, defendants-appellants assert two primary claims. First, although not objecting to the conclusion that Vi-Mil and Mohawk were a single enterprise, appellants ask as to Danin and Fredella that we reverse the district court's decision to pierce the corporate veil. Second, appellants argue that due process considerations render it improper to apply the judgment against Mohawk to anyone, such as themselves, not expressly a party to the action against Mohawk.

## II.

There is no litmus test in the federal courts governing when to disregard corporate form. The Supreme Court has, however, provided some guidance, stating that "the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice." *Taylor v. Standard Gas Co.*, 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669 (1939). The Court has further indicated that corporate form may not defeat overriding federal legislative policies. *See First National City Bank v. Banco para el Comercio Exterior de Cuba*, 462 U.S. 611, 630, 103 S.Ct. 2591, 2601, 77 L.Ed.2d 46 (1983); *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.*, 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974). This court has said,

> The general rule adopted in the federal cases is that "a corporate entity may be disregarded in the interests of public convenience, fairness and equity," [citing to *Capital Telephone Co. v. FCC*, 498 F.2d 734, 738 (D.C.Cir.1974).] In applying this rule, federal courts will look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form [citations omitted], an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine. . . .

*Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981).

ERISA, the statute sought to be enforced here, cannot be said to attach great weight to corporate form. Indeed, deferring too readily to the corporate identity may run contrary to the explicit purposes of the Act. Congress enacted ERISA in part because many employees were being deprived of anticipated benefits, which not only reduced the financial resources of individual employees and their dependents but also undermined the stability of industrial relations generally. *See* 29 U.S.C. § 1001 (1982) (statement of congressional findings

and declaration of policy); H.Rep. No. 807, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad. News 4639, 4670, 4676. Allowing the shareholders of a marginal corporation to invoke the corporate shield in circumstances where it is inequitable for them to do so and thereby avoid financial obligations to employee benefit plans, would seem to be precisely the type of conduct Congress wanted to prevent.

█ In deciding that it was appropriate to disregard Mohawk's corporate form here, the court below focused on three factors: the small respect paid by the shareholders themselves to Mohawk's separate corporate identity; the fraudulent intent of the incorporators; and the degree of injustice that would be visited on the litigants by recognizing the corporate identity. Other courts have looked to similar factors where ERISA is involved. *See, e.g., Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan v. Hroch,* 757 F.2d 184, 190 (8th Cir.1985); *Laborers Clean-up Contract Administration Trust Fund v. Uriarte Clean-up Service, Inc.,* 736 F.2d 516, 524 (9th Cir.1984).

In concluding that Danin and Fredella had not respected Mohawk's separate existence even minimally, the district court pointed out that Mohawk's board of directors had never formally met, that Mohawk kept no corporate records, and that Danin and Fredella did not charge Mohawk for its use of B & S' former equipment and facilities. From the outset, Mohawk was inadequately capitalized. The judge noted deposition testimony indicating that the only asset Danin and Fredella provided Mohawk was the use of the former B & S facilities; beyond that, the company never received any liquid assets or working capital. Since Danin and Fredella could not have expected Mohawk to be able to pay its debts, the court inferred that both men, being Mohawk's principles, had acted in bad faith in their dealings with the union.

Appellants dispute the adequacy of the record to support these findings. We find no merit in these contentions. We find ample evidence for the court to have drawn the above inferences, which were not clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Custom Paper Products Co. v. Atlantic Paper Box Co.,* 469 F.2d 178, 179 (1st Cir.1972).

█ We also accept the court's determination that to defer to the corporate form in this situation would work a clear injustice, contrary to the policies of ERISA. Congress enacted ERISA to ensure that employees were not deprived of promised benefits which they both expected and deserved. To permit Danin and Fredella to hide behind Mohawk, a paper corporation they knew was inadequately funded, and thereby avoid paying almost $100,000 in delinquent contributions would, in the circumstances shown here, tend to defeat ERISA's purposes and work a clear injustice.

We sustain the district court's decision to hold Danin and Fredella personally liable for Mohawk's obligations to its employee benefit funds.

### III.

Appellants contend that, having not been parties to the suit in which Mohawk's liability was originally determined, they cannot be made accountable for that judgment in this proceeding consistent with constitutional guarantees of due process. We disagree.

█ A person is not, of course, bound by a judgment as to which he did not have a full and fair opportunity to litigate the underlying claim. *See, e.g., Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971); *Hansberry v. Lee,* 311 U.S. 32, 40–41, 61 S.Ct. 115, 117–18, 85 L.Ed. 22 (1940). That principle does not apply, however, in the case of non-parties who "assume control over litigation in which they have a direct financial or proprietary interest...." *Montana v. United States,* 440 U.S. 147, 154,

99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979). Indeed, the Supreme Court has noted that

> [O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own ... is as much bound ... as he would be if he had been a party to the record.

*Id.*, quoting *Souffront v. La Compagnie Des Sucreries,* 217 U.S. 475, 486–87, 30 S.Ct. 608, 612, 54 L.Ed. 846 (1910); *see also General Foods v. Massachusetts Department of Public Health,* 648 F.2d 784, 789 (1st Cir.1981) (judgment will bind a non-party if he had the "power to determine what evidence and arguments should be offered in the litigation").

Danin and Fredella, as Mohawk's only shareholders, officers, and members of the board of directors, were clearly on notice of all aspects of the Union's litigation with Mohawk. They held ultimate and complete control over the litigation strategy the now defunct corporation pursued. It had been Danin himself who had negotiated the agreement with Local 226 calling for Mohawk to contribute to the union benefit funds. As sole owners of Mohawk, both men had an economic stake in the outcome of the trial and were, of course, in a position to know about everything that occurred. Given, moreover, the questionable nature of Mohawk's corporate identity, Danin and Fredella had good reason to anticipate that they might be held personally accountable for Mohawk's defaults. Hence, they had every reason to consider their own interests when devising Mohawk's defense. Similarly, because Vi-Mil and Mohawk were a single, integrated enterprise, controlled by the same people, Vi-Mil by definition had an obvious role and stake in the litigation. On these facts, we reject appellants' assertion that their due process rights are violated by their being held responsible for the judgment against Mohawk.

*Affirmed.*