**Robert J. LOWEN, et al., Plaintiffs,**

v.

**TOWER ASSET MANAGEMENT, INC., et al., Defendants.**

**No. 85 Civ. 9545 (VLB).**

United States District Court, S.D. New York.

Feb. 25, 1987.

Bettina B. Plevan, Proskauer Rose Goetz & Mendelsohn, Seham Klein & Zelman, Burton M. Epstein, c/o Steinberg & Tugendrajch, P.C., New York City, for plaintiffs.

Daniel Kornstein, Kornstein, Veisz & Wexler, New York City, Samuel Kovnat, N. Stonington, Conn., for defendants.

## MEMORANDUM

VINCENT L. BRODERICK, District Judge.

### I.

The plaintiffs, trustees of two pension plans, moved for partial summary judgment on counts two and three of their second amended complaint, which allege violations of the prohibited transaction provisions of the Employee Retirement Income Security Act ("ERISA"), § 406(b)(1) and (3), 29 U.S.C. § 1106(b)(1) and (3). They seek entry of judgment pursuant to Fed.R.Civ.P. 54(b) against defendants for restitution of all profits and other forms of consideration (i.e., $1,087,787 in fees as well as equity interests) received in violation of ERISA § 406. In addition, plaintiffs argue that they are entitled to damages for all losses (an alleged $28,336,720) from investments involving prohibited transactions, in an amount to be determined at a hearing.

The court has considered the pleadings, depositions, and exhibits on file and has considered all facts, documents, and arguments presented by the parties. On November 19, 1986 the court also heard oral argument on plaintiffs' motion. There being no genuine issues as to any material fact, I granted plaintiffs' motion and ruled that plaintiffs were entitled to judgment as a matter of law with respect to their second and third causes of action.

This memorandum supplements the oral disposition of plaintiffs' motion.

### II.

The plaintiffs are trustees of the Masters Mates and Pilots Pension Plan ("Pension Plan") and Individual Retirement Account Plan ("IRAP") (collectively referred to as "the Plans"), and bring this suit on behalf of over 3000 participants in the Plans.

The corporate defendants are Tower Asset Management Corp. ("Asset"), the investment manager to the Plans; its parent corporation, Tower Capital Corp. ("Capital") which is an investment banking corporation; and an affiliate of Asset, Tower

Securities, Inc. ("Securities"), which is a NASD/SEC registered broker-dealer.

The individual defendants, Andrew A. Levy ("Levy"), Samuel Kovnat ("Kovnat"), and W. Randolph Wheeler ("Wheeler") are officers, directors, and stockholders of the defendant corporations.[1] The three corporate defendants are each owned 50% by defendant Kovnat and 25% each by defendants Levy and Wheeler.

Defendant Asset became an investment manager to the IRAP on April 14, 1983. In the initial investment agreement $15 million of IRAP assets were assigned to Asset for management.[2] Asset became the investment manager to the Pension Plan on November 9, 1984 and was given a total of approximately $6.5 million of Pension Plan assets to manage. The Plans terminated Asset as their investment manager by letter dated November 4, 1985.

The agreements between Asset and the Plans entrusted Asset with full discretion to invest Plan assets under its control, subject to the standards set forth in ERISA, and in the agreements between the Plans and Asset. During its period as investment manager Asset purchased securities in several companies on behalf of the Plans.[3] These transactions are documented in reports of the Plans' custodian ("Marine Midland Reports").

The few employees of the corporate defendants performed services for the three corporate entities simultaneously, at offices shared by them. Bank records document numerous transfers of funds among the defendant corporations and from the corporations to the individual defendants.

Securities and Capital, in their capacities as broker/dealer and investment banker respectively, entered into agreements with many of the companies in which Plan assets were invested, often concurrently with or shortly before Asset acted on behalf of the Plans. The services Securities and Capital agreed to provide to these companies primarily entailed assistance with capitalization, in the form of public offerings and private placement of debentures, in return for which these defendants were to receive commissions, fees, and other forms of consideration, including shares of stock.[4] The corporate defendants received fees and commissions totaling $1,087,787 or stock ownership interests, or both, from at least twenty-six companies in which Plan assets were invested. The next section of this memorandum sets forth the fees obtained by the corporate defendants and the contemporaneous nature of the transactions undertaken by the various defendants.

### III.

*Receipt of Cash Payments*
*Rolfite (and Combustion Catalyst)*

By agreements dated August 5 and August 16, 1983 defendant Securities was retained by the Rolfite Company ("Rolfite") to provide various investment banking services, in return for which it was to receive a $25,000 retainer fee, fees of 5% of the amounts raised through private placements on behalf of the company, warrants to purchase Rolfite common stock and other consideration. Pursuant to these agreements, Rolfite issued to Securities a "retainer" check dated August 15, 1983 in the amount of $25,000.

On August 16, 1983 Asset purchased, on behalf of IRAP, subordinated debentures of Rolfite in the principal amount of $200,000; additional subordinated debentures were purchased on October 28 and Decem-

---

1. Walter Levering is named as a defendant in plaintiffs' second amended complaint; however, plaintiffs have not sought summary judgment against him.

2. Plaintiffs have alleged that a total of $24 million of IRAP assets was assigned to Asset for management. While there is no documentation of the additional $9 million of assigned assets, an analysis of investments by the Plans' custodian supports the alleged $24 million assignment.

3. A summary of Assets' investments made on behalf of the Plans reveals that as of February 28, 1986 the Plans had shares of twenty-nine companies.

4. In many of these transactions Securities served as the broker/dealer for Capital.

ber 2, 1983 for $225,000. Securities received from Rolfite an additional $18,750 in investment banking fees between October and December 30, 1983.

By agreement dated November 1, 1984, defendant Asset contracted to purchase shares of Rolfite preferred stock on behalf of IRAP. By this same agreement, Rolfite undertook to pay Asset a flat retainer of $5,000 per month, for which Asset was to aid Rolfite in its financial planning and related activities. The retainer was to be paid, however, only for so long as IRAP owned any of the stock purchased pursuant to the agreement. The Marine Midland Reports show that Asset in fact acquired, on behalf of the IRAP, 50,000 shares of preferred stock of Rolfite in 1984 for $500,-000 and 33,333.33 shares in the first quarter of 1985 for $250,000, in addition to common stock, warrants and promissory notes. Capital received a retainer of $10,-000 from Rolfite in March, 1985.

One of the primary services rendered on behalf of Rolfite was the securing of financing "for the benefit of the company involving a research and development tax shelter partnership investment vehicle called Combustion Catalyst Partnership." Defendant Kovnat's deposition, Tr. 197–98. In connection with this financing, Capital received investment banking fees totalling $136,000.

### Best Brands

By Memorandum of Understanding dated August 23, 1983 Securities contracted with Best Brands, Inc. ("Best Brands") to "immediately attempt" to raise $400,000 in capital and to provide related investment banking services, in return for which it was to receive 700,000 shares of stock and a $50,000 investment banking fee. According to defendant Levy, it was "intended" that this money would be raised by investing IRAP funds. Defendant Levy's deposition, Tr. 114–15. Asset purchased subordinated debentures of Best Brands on behalf

of IRAP in August and October 1983. Capital received from Best Brands $25,000 in fees for services rendered. Levy deposition, Tr. 116–17. In addition, Capital received a $5,000 check from Best Brands dated July 9, 1985 for consulting services.

### KCR

By agreements dated October 23, 1984 and April 2, 1985 Capital agreed with KCR Technology, Inc. ("KCR") to sell newly issued shares of KCR common stock and to provide related investment banking services, in return for which it was to receive a cash fee of $50,000 and other consideration.

In late 1984 and early 1985, Asset purchased, on behalf of the Plans, common stock of KCR at an aggregate cost of $150,000.

Fees totalling $10,000 were received from KCR by Capital in September, 1985, and defendant Levy has testified that the remaining $40,000 of its fee is a receivable from KCR. Levy deposition, Tr. 123.

### National Satellite

By agreement dated June 22, 1984 Capital agreed with National Satellite Entertainment Network Corp. ("National Satellite") to raise up to $1,000,000 in 14½% debentures due June 22, 1987 and to provide investment banking services, in return for a $50,000 advance retainer and a fee of $5,000 per month, beginning in July, 1984.

A subordinated debenture dated June 22, 1984, bearing interest at 14½% and due June 22, 1987, was purchased by Asset on behalf of IRAP for $500,000, and another debenture was purchased later in 1984 for $250,000.

Pursuant to its investment banking agreement Capital received from National Satellite $50,000 in investment banking fees, additional fees totalling $35,000, and 111.76 million shares of the company's common stock that it still holds.[5]

---

5. Plaintiffs have submitted listings of the present equity holdings by the defendants. As defendants have not contested these equity in-

terests I assume that they do in fact exist for purposes of summary judgment.

## American Davey

By agreement dated March 30, 1984 Capital agreed to effect as soon as possible, on behalf of American Davey Corporation ("American Davey"), a two-stage private placement of securities valued in excess of $1 million, in return for a 5% commission on all funds raised and monthly fees of $2,000 (once $350,000 was raised), and $5,000 (once an additional $700,000 was raised).

Thereafter, Asset purchased from American Davey, on behalf of IRAP, promissory notes and subordinated debentures at an aggregate cost of $700,000.

Capital received from American Davey an investment banking fee of $17,500.00.

## Double Eagle Lines

According to the Minutes of the Initial Meeting of Directors of Double Eagle Lines, Inc. ("Double Eagle") on October 10, 1984, Double Eagle resolved to borrow $300,000 from IRAP through the issuance of debentures in that amount, and to pay Capital an initial investment banking fee of $25,000, "upon the funding of the aforementioned debenture."

Asset in fact purchased on behalf of IRAP a subordinated debenture of Double Eagle dated October 25, 1984 at a cost of $300,000, and in conjunction with this transaction Capital received a $25,000 investment banking fee.

## OAO

Capital and OAO Corporation ("OAO") observed the terms of an unsigned investment banking agreement dated October 11, 1984, under which Capital agreed to raise capital and to provide related services for a fee. In 1984 over $500,000 of IRAP funds were invested in OAO. Capital received a $30,000 fee from OAO's principal, Cecile D. Barker.

## Polycell

A letter dated July 6, 1984 from defendant Levy to one Eugene Schuster describes a transaction whereby Asset would purchase for IRAP a $125,000 promissory note of Polycell, Inc., and at the same time Capital was to receive $10,000 in consulting fees, and 20,000 shares in stock upon payment of $200. This transaction was carried out in substantial part; in 1984 IRAP acquired a $125,000 note of Polycell, and Capital acquired Polycell stock and received $3,333.33 in fees.

## Filmtel/Super-K

By an agreement dated January 25, 1984 Capital undertook to arrange private placements and to provide related investment banking services on behalf of Filmtel, Inc. (which later was merged with Super-K Entertainment) ("Filmtel/Super-K"), in return for a $25,000 retainer fee and other consideration. Asset in 1984 purchased, on behalf of IRAP, a subordinated debenture of Filmtel in the principal amount of $250,000.

Capital received from Filmtel/Super-K investment banking fees totalling approximately $50,000, of which $25,000 is documented by Capital's bank records.

## BTI

By agreement dated April 12, 1984 Capital agreed to raise capital and provide related investment banking services for BTI Corporation ("BTI") in return for a 5% commission on all capital raised and a retainer of $5,000 per month, with the first three months payable in advance. Asset purchased, on behalf of the Plans, subordinated debentures in the principal amount of $225,000 on April 13, 1984, and Capital on April 18, 1984 received $25,000 in management fees from BTI.

## Ultra Magnetics

By agreement entered into on July 25, 1983, Ultra Magnetics Technology, Inc. ("Ultra Magnetics") authorized Securities, in return for fees and equity interests, to sell on its behalf a secured debenture in the amount of $250,000, with an option for Securities to place additional debentures up to $250,000. As contemplated by this agreement, Asset purchased subordinated debentures of Ultra Magnetics in a total

amount of $500,000 on behalf of the Plans. Pursuant to the agreement Capital received a $10,000 placement fee from Ultra Magnetics.

### Falconhead (and General American)

On June 1, 1984 Capital agreed with Falconhead Development Corp. ("Falconhead"), a company created by Asset with IRAP funds and operated and controlled by Asset on behalf of IRAP, that Capital would receive a monthly fee of $15,000, in return for serving as manager of properties owned by Falconhead.

Defendants received from Falconhead a $10,000 retainer, and an additional $50,000. designated as "loans".

Capital also received $10,000 in fees on February 1, 1985 from General American Properties Corp. ("General American") which, in a transaction implemented by defendants, borrowed $500,000 from Falconhead.

### Pan Ocean Navigation

By agreement dated June 1, 1984 Capital agreed with Pan Ocean Navigation, Inc., a company created by Asset with IRAP funds and operated and controlled by Capital on behalf of IRAP, to manage the repair, conversion and refurbishment of the MS Scandinavian Sea, in return for a fee of $15,000 per month. Between May and November, 1985 Capital received from Pan Ocean consulting fees, supervision fees, management fees, and wire transfers totalling $183,205, which were paid out of a Pan Ocean account controlled by Capital.

### AHL

By agreement dated November 14, 1984, American Heavylift Shipping Company ("AHL"), a company in which Plans funds were invested, agreed to employ Capital as a financial consultant for the period commencing December 1, 1984 and continuing for two years thereafter, and to pay Capital a minimum retainer of $8,000 per month. Pursuant to this agreement, Capital received five monthly $8,000 retainers from AHL.

### Rainbow Navigation

Capital received fees of $15,000 on April 20, 1984 and $182,000 on December 6, 1984 from Rainbow Navigation, Inc. ("Rainbow"), a company to which IRAP lent $300,000 and in which IRAP had at least a 15% stock interest.

By virtue of the transactions entered into by the corporate defendants Capital and Securities with Rolfite, Combustion Catalyst, Best Brands, KCR, National Satellite, American Davey, Double Eagle, OAO, Polycell, Filmtel/Super-K, BTI, Ultra Magnetics, Falconhead, General American, Pan Ocean, AHL, and Rainbow, the defendants contracted to receive cash fees in excess of $1 million. Asset or Capital in fact received from these companies at least $940,-788 in cash payments.

Defendants also received cash payments totalling $146,999 from various entities in which Plan assets were invested: Dataset Communications, Inc. ("Dataset"), Quazon Corp. ("Quazon/.Gammon Group"), Laser-Med International, Inc. ("Laser-Med"), Night Vision Corp. ("Night Vision"), P.C. Electrical Corp. ("P.C."), Sea-Bridge Express, Inc. ("Sea-Bridge"), Seatron Corp. ("Seatron"), Technical Management, Inc. ("TMI"), and Venus Cruise Lines, Inc. ("Venus").

### IV.

### Acquisition of Equity Interests

In connection with the investment of Plan assets in various corporations, the corporate defendants acquired equity interests in various of those corporations, for nominal payments or at discounted notes. Thus defendants Capital and Securities acquired stock or related. equity interests in American Davey, Commercial Cargo Spacelines, Inc., Dataset, Filmtel, Quazon/Gammon Group (affiliated with Q.C. Leasing), Golf Technology, Inc., KCR, National Satellite, Night Vision, OAO Corp., and Rolfite, for nominal payments or at discounted rates. These defendants still hold 375,000 shares of common stock of Commercial

Cargo Spacelines, Inc., 33 shares of common stock of Dataset, 750 shares of common stock of the Quazon-Gammon Group, 100,000 of common stock of Golf Technology, Inc., 2,500,000 shares of restricted common stock and an additional 200,000 shares of common stock of Night Vision Corp., and 55 shares of common stock of OAO.

### Defendants' Prior Equity Interests

Substantial Plan assets were invested in companies in which the individual and corporate defendants already had a substantial ownership interest. For example, Seatron and TMI were substantially or wholly owned or controlled by one or more of the defendants before, and apart from, the Plan investments. These interests are detailed below:

*Seatron:* Levy and Wheeler had substantial stock interests. During the period when Plan funds were invested, Seatron completed the acquisition of shares of G.R. Associates, in which Kovnat's wife had a substantial ownership interest.

*TMI:* Kovnat was founder, chairman and a substantial shareholder. Following the investment of Plan assets, TMI acquired the stock of Buckeye Petroleum Company, Inc., which was owned and controlled in substantial part by defendants Levy and Wheeler.

### V.

This court derives jurisdiction over this action from section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1). An action brought by fiduciaries is authorized by section 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3). The Pension Plan is a defined benefit plan within the meaning of Section 3(35) of ERISA, 29 U.S.C. § 1002(35). IRAP is an individual account or defined contribution plan, within the meaning of Section 3(34) of ERISA, 29 U.S.C. § 1002(34).

The plaintiffs' § 406 claims are based on the following arguments: (1) the defendants were *all* fiduciaries within the meaning of ERISA; (2) defendants received fees and other forms of consideration from companies in which Plan assets were invested pursuant to agreements entered into at or about the time of the investments; and (3) defendants invested Plan assets in companies in which they had, or were soon to have, ownership interests.

The defendants have argued that § 406 only imposes liability on fiduciaries as defined under ERISA, and that the defendants, with the exception of Asset, are not fiduciaries under the Act. As such, the defendants state that plaintiffs' motion should be denied because the fees plaintiffs have challenged were: (1) not received by a "fiduciary" as required for liability under 406(b); (2) not received "in connection with the investment of assets of the plan," as required under 406(b); (3) reasonable compensation for services rendered and therefore exempt under § 408(b); and (4) consented to by the plaintiffs, thereby making them proper and estopping plaintiffs' challenge to them.

While the plaintiffs' central claim is that defendants engaged in prohibited transactions as described in § 406(b), a threshold matter that must be determined is whether or not the defendants were fiduciaries under ERISA. The term "fiduciary" is defined under ERISA as follows:

(21)(A) Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises *any* discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or *indirect*, with respect to any moneys or other property of such plan, or has *any* authority or responsibility to do so, or (iii) he has *any* discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A) (*emphasis added*).

Plaintiffs set out three alternative grounds for holding all of the defendants liable as fiduciaries for both restitution and

damages. Specifically, they contend that all of the defendants should be held liable because: (1) they are fiduciaries; (2) they conspired with a fiduciary to enter into prohibited transactions; or (3) their commingling of operations warrants the disregarding of any separate identity.

■ The term "fiduciary" is to be liberally interpreted to effect the statute's remedial purpose, and the courts have "taken a broad view in deciding whether a particular service provider should be considered a fiduciary under ERISA." *Brink v. DaLesio,* 496 F.Supp 1350, 1375 (D.Md.1980) *aff'd in part and rev'd in part,* 667 F.2d 420 (4th Cir.1982); *see also* Kroll & Tauber, *Fiduciary Responsibility and Prohibited Transactions under ERISA,* 14 Real Property, Probate and Trust Journal, 657, 660 (1979). As the court noted in *Eaton v. D'Amato,* 581 F.Supp. 743, 746 (D.D.C.1980), "[a]pplying a restrictive judicial gloss to the term 'fiduciary' itself would, in effect, enable trustees to transfer important responsibilities to a largely immunized 'administrative' entity. A clear congressional desire to expand the scope of fiduciary standards of conduct should not be so undermined."

Congress' intent to give broad scope to the term "fiduciary" is clearly set out in the legislative history of ERISA:

> The term 'fiduciary' ... includes persons to whom 'discretionary' duties have been delegated by named fiduciaries. While the ordinary functions of consultants and advisors to employee benefit plans ... may not be considered as fiduciary functions, it must be recognized that there will be situations where such consultants and advisors may because of their special expertise, in effect, be exercising discretionary authority or control with respect to the management or administration of such plan or some authority regarding its assets. In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition.

1974 U.S.Code Cong. & Admin.News 5103.

The plaintiffs have argued that the individual and corporate defendants, with the exception of Levering, were fiduciaries within the meaning of ERISA because "they had authority and control over investments" and were therefore obligated to observe the fiduciary standards of conduct established by the Act.

### A. *The Corporate Defendants*

The defendants do not dispute Asset's status as a fiduciary, but argue that it is the "only person or entity among the defendants that rendered any investment advice to the plans ... pursuant to its investment management agreement with the plans." There is, they assert, no evidence tending to suggest that "Capital and Securities 'controlled' Asset, which in turn had authority over the investment of Plan assets."

While the evidence supports defendants' position that only Asset (and not Securities or Capital) rendered investment advice, the defendants have failed to counter plaintiff's evidence that defendants exercised discretionary authority and control over the management or disposition of the Plans' assets, thus rendering applicable 29 U.S.C. § 1002(21)(A)(i) and (iii), *supra.*

The nature and extent of the "control" required under § 1002(21)(A) is treated in 29 C.F.R. § 2510.3–21(e)(2), which provides: "[f]or purposes of this paragraph the term 'control' means the power to exercise a controlling influence over the management or policies of a person other than an individual."

■ Although Asset was the entity engaged to make investment decisions regarding Plans' assets, defendants Capital and Securities used the Plans' funds as a basis for their investment banking agreements. Capital in at least one agreement with a corporation in which Plan funds were invested openly discussed Asset's management of the Plans. Furthermore, there is evidence of Capital's and Securities' authority and control with respect to the management and disposition of Plan assets. Thus in one instance, where IRAP purchased through Asset a $125,000 prom-

issory note of Polycell, Inc., Capital directed the details of the closing, making sure that Polycell signed and delivered all the necessary documents.

The equity interests of Capital and Securities in companies in which the Plans invested gave Capital and Securities indirect control over the Plans' assets. This indirect control is even referred to by defendants in certain of their investment banking agreements.

Furthermore, all the corporate defendants were owned and controlled by the same individuals. Through those individuals the corporate defendants acted on each other's behalf and in concert with one another. Through this concert of action the corporate defendants exercised actual discretionary control over the Plans' assets.

Defendants Capital and Securities acted as fiduciaries under ERISA and should be subject to its fiduciary standards. Unlike Asset, Capital and Securities are not named fiduciaries and are therefore, fiduciaries only to the extent that they performed one or more of the functions described in section 29 U.S.C. § 1002(21)(A). *See also* 29 C.F.R. § 2509.75–8, FR–16Q ("The personal liability of a fiduciary who is not a named fiduciary is generally limited to the fiduciary functions, which he or she performs with respect to the plan").

The corporate defendants' various acts were sufficient to constitute all of them fiduciaries as that term is defined under ERISA § 1002(21)(A).

### B. *The Individual Defendants*

■ "One question that is not resolved by ERISA is whether officers or directors of a corporation that is itself a fiduciary can be classified as fiduciaries on an individual basis.... The evidence is conflicting on this point." Little & Thrailkill, *Fiduciaries Under ERISA: A Narrow Path to Tread*, 30 VAND.L.REV. 1, 7 (1977). Although there are no explicit ERISA provisions pertaining to piercing the corporate veil, the remedial thrust of ERISA is not to be frustrated by meticulous emphasis upon corporate form. The First Circuit has

quite recently dealt with the issue of piercing the corporate veil in an ERISA context:

> ERISA, the statute sought to be enforced here, cannot be said to attach great weight to corporate form. Indeed, deferring too readily to the corporate identity may run contrary to the explicit purposes of the Act. Congress enacted ERISA in part because many employees were being deprived of anticipated benefits, which not only reduced the financial resources of individual employees and their dependents but also undermined the stability of industrial relations generally. Allowing the shareholders of a marginal corporation to invoke the corporate shield in circumstances where it is inequitable for them to do so, and thereby avoid financial obligations to employee benefit plans, would seem to be precisely the type of conduct Congress wanted to prevent.

*Alman v. Danin,* 801 F.2d 1, 3–4 (1st Cir. 1986) (*citations omitted*).

Most of the decisions which address the personal liability of officers, directors and shareholders under ERISA do not involve the officers and shareholders of corporate fiduciaries. They concern questions of withdrawal liability from multiemployer plans or, as did *Alman,* failure to make contributions as called for in collective bargaining agreements.

Judge Sweet of this court recently spoke to the issue of whether shareholders or officers can be held personally liable under ERISA in *Trustees of the UIU Health and Welfare Fund and UIU Pension Trust v. New York Flame Proofing Co., Inc., et al.,* 649 F.Supp. 843 (S.D.N.Y.1986). In that case, the trustees of a pension fund brought an action to collect allegedly delinquent contributions owed by two corporations under a collective bargaining agreement against the corporations and their president and sole shareholder. The trustees' complaint alleged that the individual defendant was the control person of the defendant corporations and therefore liable as an "employer" under 29 U.S.C. § 1002(5). The individual defendant moved

for summary judgment on the grounds that he never acted outside his capacity as president of the corporations, that he never transacted personal business through the corporate structures, commingled personal and corporate funds or assumed personal liability for any corporate debts. In granting the individual defendant's motion, Judge Sweet said:

> There is a presumption that the corporation is a separate entity from the shareholders or officers and thus only a corporation is generally liable for violations of ERISA. The question of whether the corporate veil insulates Belmont against liability under ERISA is a question of federal substantive law, though state law may be used as a reference guide. Some of the factors which should be considered are 'the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice visited on the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators ...' Since there is no indication that the corporations were created with an intent to defraud or that their assets would be insufficient to satisfy a judgment, the Union Funds have not provided any basis for establishing the personal liability of Belmont.

*New York Flame Proofing,* 649 F.Supp. at 847–48 (*citations omitted*).

A similar approach has been taken by other courts, which have found in withdrawal liability or delinquent contribution situations that the traditional factors necessary to pierce the corporate veil must be present in order to impose individual liability under ERISA. *See Alman v. Danin,* 801 F.2d 1 (1st Cir.1986); *Connors v. P & M Coal Company,* 801 F.2d 1373 (D.C.Cir. 1986); *Solomon v. Klein,* 770 F.2d 352, 354 (3rd Cir.1985).[6]

There is no definitive test under federal law to determine when the corporate form should be pierced. *Alman v. Danin,* 801 F.2d at 3.[7] As the court in *Brunswick Corp. v. Waxman,* 459 F.Supp. 1222, 1229 (E.D.N.Y.1978), *aff'd* 599 F.2d 34 (2d Cir. 1979), said: "[t]he circumstances under which the court should disregard the corporate fiction are not always clear and it is difficult, if not impossible, to formulate a precise and categorical definition applicable to all situations."

Criteria have been identified which are applicable in determining whether or not the corporate veil should be pierced:

> In New York, several criteria are paramount in determining whether to pierce a corporate veil: 1) the absence of the formalities which are part and parcel of normal corporate existence, i.e., the election of directors, keeping of corporate records; 2) inadequate capitalization; 3) personal use of corporate funds; and 4) the perpetration of fraud by means of the corporate vehicle.... (citations omitted) Further, a corporation's form may be disregarded where the corporation has been a mere shell 'dominated

---

**6.** Thus, in *Alman v. Danin,* for example, a union brought an action under ERISA seeking enforcement of a union contract which called for a corporation to make weekly contributions to various union-operated employment benefit plans. In establishing individual liability in *Alman,* the lower court focused on factors traditionally regarded when questions involve piercing the corporate veil. Specifically, the district court (as reported by the court of appeals) looked at three factors: "the small respect paid by the shareholders themselves to Mohawk's separate corporate identity; the fraudulent intent of the incorporators; and the degree of injustice that would be visited on the litigants by recognizing the corporate identity." 801 F.2d 1, 4 (1st Cir.1986).

**7.** While there is no "litmus test" in the federal courts governing when to disregard corporate form, the First Circuit has said:

> The general rule adopted in the federal cases is that 'a corporate entity may be disregarded in the interests of public convenience, fairness and equity,' [*citing to Capital Telephone Co. v. FCC,* 498 F.2d 734, 738 (D.C.Cir.1974).] In applying this rule, federal courts will look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form [*citations omitted*], an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine.

*Alman,* 801 F.2d at 3 *citing Town of Brookline v. Gorsuch,* 667 F.2d 215, 221 (1st Cir.1981).

and controlled by the individuals to carry on their own personal business.'

*Mikropul Corp. v. Desimone & Chaplin-Airtech, Inc.,* 599 F.Supp. 940, 943 (S.D.N.Y.1984), *quoting England Strohl/Denigris, Inc. v. Weiner,* 538 F.Supp. 612, 613–14 (S.D.N.Y.1982), *aff'd* 740 F.2d 954 (2d Cir.1984).

■ The facts before this court provide a more-than-adequate basis for piercing the corporate veil, thereby holding the individual defendants, Levy, Kovnat, and Wheeler, personally liable. The close and intimate relationship between the corporate and individual defendants is clear. The few employees of the corporate defendants performed services for all three entities simultaneously, at offices shared by them, without particular regard for which entity paid their salaries. The corporate defendants had virtually "zero net worth." The company bank records produced by defendants document numerous transfers of funds among the corporate entities in the form of loans, dividends or investment capital, and from Capital to the individual defendants in the form of reimbursements for travel and related expenses; a large portion of the expenses reimbursed to Kovnat and Wheeler are undocumented.

Given the above, to the extent that the corporate defendants are fiduciaries under ERISA, the corporate veil will be pierced and the individual defendants are deemed to be fiduciaries.

## VI.

Congress adopted specific prohibitions in Section 406, 29 U.S.C. § 1106, "to prevent categories of transactions which offer a high potential for insider abuse of plans or for loss of plan assets." *Freund v. Mar-*

shall & Ilsley Bank, 485 F.Supp. 629, 637 (W.D.Wis.1979) *(citation omitted)*.

In pertinent part, § 406(b) prohibits a fiduciary from dealing "with the assets of the plan in his own interest or for his own account," (§ 406(b)(1)) or from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." (§ 406(b)(3)).

The legislative history of § 406(b) and relevant case law indicate that Congress sought to prevent "kickbacks", making "illegal per se the types of transactions that experience had shown to entail a high potential for abuse." *Donovan v. Cunningham,* 716 F.2d 1455, 1465 (5th Cir.1983) *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984) *(citations omitted)*. *See* 1974 U.S.Code Cong. & Admin.News, 4639, 5038, 5089.[8]

Section 406(b) creates a *per se* ERISA violation:

> Section 1106(b) thus creates a per se ERISA violation; even in the absence of bad faith, or in the presence of a fair and reasonable transaction, § 1106(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans.

*Gilliam v. Edwards,* 492 F.Supp. 1255, 1263 (D.N.J.1980) *citing Cutaiar v. Marshall,* 590 F.2d 523, 529–30 (3rd Cir.1979); *see also Brink v. DaLesio,* 496 F.Supp. 1350 (D.Md.1980), *aff'd in part and rev'd in part,* 667 F.2d 420 (4th Cir.1982) (trustee of a pension plan, having accepted gratuities from individuals providing services to the plan, violated ERISA § 406(b)(3) even though it had not been proven that the

---

8. ERISA § 406(b), 29 U.S.C. § 1106(b), was set up with the following rationale:

> The prohibitions of section 406(b) supplement the other prohibitions of section 406(a) of the Act by imposing on parties in interest who are fiduciaries a duty of undivided loyalty to the plans for which they act. These prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or re-

> sponsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.

29 C.F.R. § 2550.408b–2(e)(1).

**1554**

transaction was a *quid pro quo* for the gratuities or that harm had resulted).

### A.  *§ 406(b)(1)*

■ The defendants' violation of § 406(b)(1) is readily apparent. On numerous occasions the defendants dealt with the assets of the Plans in their own interests or for their own accounts. The following are a few examples of the defendants' use of the Plans' assets as a vehicle for advancing their own interests.

(1) Levy, Kovnat, and Wheeler, as officers and directors of Asset, caused the Plans to invest in companies in which they had equity interests.

(2) Asset agreed to provide consulting services to Rolfite (for a flat retainer of $5,000 per month) at the same time as it agreed to invest the Plans' funds in Rolfite.

(3) Securities agreed to provide investment banking services to Rolfite for large fees and commissions on the same day as its subsidiary Asset purchased $200,000 in subordinated debentures for the Plans.

(4) Capital received a $25,000 investment banking fee from Double Eagle Lines, the payment of which was contingent on a $300,000 loan made by the Plans.

### B.  *§ 406(b)(3)*

■ Plaintiffs have argued that Asset, the entity engaged to make investment decisions regarding the Plans' assets, channeled Plan funds into companies with which Securities and Capital had recently or contemporaneously entered into investment banking agreements; these investment banking agreements then resulted in equity

interests and fees of $1,087,787 being received by defendants Capital and Securities.

The defendants have taken the position that plaintiffs' § 406(b)(3) claim should fail because plaintiffs have not shown the "required causal connection between the fees and Plan investments." Defendants assert that the plaintiffs "rely entirely on speculation and conjecture and in several instances, on nothing more than coincidences in the timing of certain investments."

The plaintiffs have provided sufficient evidence to demonstrate that the defendants acted in concert and in violation of § 406(b)(3). The following are but a few examples:

(1) Asset received consulting fees from Rolfite, a company in which it was investing Plan assets.

(2) Securities received a $25,000 fee from Rolfite for investment banking services which included the private placement of capital.

(3) Capital obtained a $25,000 investment banking fee from Double Eagle, contingent upon the Plans' purchase of a $300,000 debenture.

### C.  *Exemptions Under § 408*

■ The defendants have argued that their receipt of consideration was reasonable compensation for services actually rendered and therefore, falls under exemptions provided in § 1108(b)(2) and (c)(2).[9] The argument does not have merit.

The Department of Labor regulations provide that acts otherwise prohibited by

---

**9.** Section 1108(b)(2) and (c)(2) provide:

(b) The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:

\*    \*    \*    \*    \*    \*

(2) Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.

(c) Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from—

\*    \*    \*    \*    \*    \*

(2) receiving any reasonable compensation for services rendered, or for reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; except that no person so serving who already receives full-time pay from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such a plan shall receive compensation from such plan, except for reimbursement of expenses properly and actually incurred;

29 U.S.C. § 1108(b)(2) and (c)(2).

§ 406(b) are not exempted under § 408(b)(2):

> [S]ection 408(b)(2) does not contain an exemption from acts described in section 406(b)(1) of the Act ... or section 406(b)(3) of the Act.... Such acts are separate transactions not described in section 408(b)(2).

> If the furnishing of office space or a service involves an act described in section 406(b) of the Act (relating to acts involving conflicts of interest by fiduciaries), such an act constitutes a separate transaction which is not exempt under under 408(b)(2) of the Act.

29 C.F.R. §§ 2550.408b–2(a), (e).[10]

■ Section 1108(c)(2) authorizes a fiduciary to receive "reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan ..." It pertains to compensation for services to the plan, and provides no exemption with respect to compensation "from any party dealing with such plan in connection with a transaction involving the assets of the plan." § 1106(b)(3).

Although there are few documented instances of Asset receiving direct compensation for Plan-related investments, the transactions with Rolfite exemplify how Asset used the Plan investments to derive other compensation. In the Rolfite case, Asset, in conjunction with its agreement to purchase debentures from Rolfite on behalf of the Plans, also contracted to provide consulting services for a fee. Asset's consulting services to Rolfite were not part of their Plan-related services.

The defendants have argued that plaintiffs' knowledge and approval of the fees obtained by Capital and Securities estop

them from challenging the fees. This "consent" argument is based on the theory that a "fiduciary may act on behalf of a beneficiary even in the face of an apparent or potential conflict of interest—provided the beneficiary is aware of such conflict and consents to the fiduciary's continuing to act on his behalf."

■ Plaintiffs, however, were not beneficiaries but trustees. A beneficiary's consent to a trustee's action is qualitatively different than a trustee's consent to a violation by another fiduciary, particularly an investment manager. Section 1105(a)(3) of ERISA provides in relevant part that "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan ... (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts ... under the circumstances to remedy the breach." A trustee's consent to a prohibited transaction would not absolve the fiduciary responsible from a finding of § 406 liability; the consent would itself be violative of ERISA.[11]

### VII.

■ The starting point for determining relief under ERISA is 29 U.S.C. § 1109(a), which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and

---

**10.** The Department of Labor ("DOL") regulations have been given great weight by courts interpreting the provisions of § 1108, and will be followed by this court as well. *See Donovan v. Daugherty,* 550 F.Supp. 390, 404 n. 3 (S.D.Ala. 1982); *Gilliam v. Edwards,* 492 F.Supp. 1255, 1262–63 (D.N.J.1980); *Marshall v. Kelly,* 465 F.Supp. 341, 354 (W.D.Okla.1978).

**11.** In particular, § 1105(c) and (d) lay out the provisions having to do with the allocation of fiduciary responsibility of investment managers.

The investment management agreements between Asset and the Plans vested Asset with fiduciary responsibility for managing the funds of the Plans. Thus, regardless of consent by the trustees, the investment managers had an affirmative obligation not to breach their fiduciary duties.

shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary ...

Thus "ERISA grants the court wide discretion in fashioning legal and equitable relief to make the plan whole and protect the rights of the beneficiaries, including recission of unlawful transactions and recovery of monetary loss to the plan." *Gilliam v. Edwards,* 492 F.Supp. 1255, 1266–67 (D.N.J.1980) *(citations omitted ); see also Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 643 (W.D.Wis.1979).

The plaintiffs are entitled to: (1) restitution to the Plans of all profits and other forms of consideration received by defendants in violation of ERISA § 406; and (2) the full extent of the Plans' investment losses in companies from which defendants received fees.

Plaintiffs have made a clear showing that the individual and corporate defendants profited by their receipt of fees and other forms of consideration "in connection" with the investment of Plan assets. There being no issues of material fact as to the amount of fees collected by defendants, judgment has been entered ordering restitution of those fees, totalling $1,087,787, as well as the identified equity interests obtained by defendants in connection with the investment of Plan assets.