**EXPLOSIVES CORPORATION OF AMERICA, et al., Plaintiffs, Appellants,**

v.

**GARLAM ENTERPRISES CORPORATION, et al., Defendants, Appellees. (Two Cases)**

**EXPLOSIVES CORPORATION OF AMERICA, Plaintiff, Appellee,**

v.

**GARLAM ENTERPRISES CORPORATION, Defendant, Appellant.**

**Nos. 86–1303, 86–1362 and 86–1650.**

United States Court of Appeals, First Circuit.

Heard Feb. 5, 1987.

Decided April 30, 1987.

Rehearing and Rehearing En Banc Denied June 3, 1987.

Stuart G. Oles with whom Oles, Morrison & Rinker, Seattle, Wash., and Salvador Antonetti and Fiddler, Gonzalez & Rodriguez, San Juan, P.R., were on brief, for plaintiffs, appellants.

Charles A. Cordero with whom Cordero, Colon & Miranda, Old San Juan, P.R., were on brief, for defendants, appellees.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

This appeal stems from a contract between Garlam Enterprises Corporation (Garlam) and Explosives Corporation of America (Explo). On January 3, 1972, Explo sued Garlam for breach of contract. Garlam filed an answer and brought a counterclaim alleging breach of contract by Explo. After two jury-waived trials, one on liability and one on damages, Explo was found liable to Garlam in the amount of $2,423,177.[1] Explo has appealed the liability finding, the damages award, and the award of postjudgment interest. It also claims that the adjudications made by the Superior Court of Puerto Rico in a suit brought by Garlam against the Puerto Rico Highway Authority were binding on Garlam and the district court and require a reversal of the judgment. Garlam has appealed from a denial of its motion to substitute Rockor, Inc., for Explo as the defendant-appellant in the contract action. Garlam also appeals the district court's refusal to award it attorney's fees, costs and prejudgment interest.

## I. CONTRACT LIABILITY

### A. *The Findings and Evidence*

The district court made extensive and detailed findings of fact which we have reviewed pursuant to the command of Federal Rule of Civil Procedure 52: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Based on our examination of the trial transcript, depositions and exhibits, we conclude that the district court did not make any clearly erroneous findings of fact. Our summary of the evidence and findings follows.

Garlam was the successful low bidder for the construction of one section of a high-

way in Puerto Rico running from San Juan to Ponce. It entered into a contract with the Puerto Rico Highway Authority to do the work for an estimated total price of $13,489,412.39. The contract was advertised and bid as a series of forty-one different work items. Garlam submitted a separate bid price for each. Garlam's total bid was calculated by multiplying each work unit price by the estimated quantities of work to be done and then adding up the amounts for each of the forty-one work items. The estimated quantities of work were supplied by the Highway Authority.

Two work items are of special significance. Item 4, entitled Unclassified Excavations, required, *inter alia*, the mass blasting of rock wherever found. Garlam's bid was $2.03 per cubic meter on an estimated quantity of 4,680,000 cubic meters of material to be excavated. Garlam had to excavate the material from the job site and deposit it in designated embankment areas as fill. Item 35 covered presplitting, which is a procedure for limiting the effects of rock blasting to a restricted area. Garlam's bid price for this work was $1.40 per lineal foot on an estimated quantity of 300,-000 lineal feet; the total bid price was $420,000.

After a period of negotiations between Raymond Garffer, president of Garlam, John W. Goode, division general manager for Explo, and Hugh E. Oswald, general counsel for Explo, a contract was executed on April 28, 1971. An amendment to the contract executed May 5, 1971, stated that Explo would begin work "on May 12, 1971, for a total of four hundred eighty-nine (489) calendar days and shall terminate said work September 22, 1972." The contract stated that "time was of the essence."

The contract provided that Explo would perform all the mass blasting necessary under Item 4 of the prime contract between Garlam and the Highway Authority at a unit price of .51 cents per cubic meter of material. Explo also agreed to do the pres-

---

**1.** Judge Bootle heard and decided the liability phase of the case. Judge Cerezo has decided all of the other issues.

plitting required under Item 35 of the prime contract at the rate of .70 cents per lineal foot. The unit price clause of the contract contained the following provision: "Blasted rock fragments shall average up to a maximum of 15 inches in size." This language was the result of negotiations between Garffer, Goode and Oswald. The words "up to a maximum" were inserted at the insistence of Garffer; the word "average" came from Goode. Oswald drafted the composite clause. Garffer testified that he expected that ninety to ninety-five percent of the blasted material would be less than fifteen inches in size. He acknowledged that inevitably some large boulders would be produced, but anticipated that they would be reduced in size by secondary blasting. Garffer also testified that when he first met with Albert Teller and John Goode, who were in charge of Explo's field operations in Puerto Rico, he asked them if they could give him an average product four to six inches in size and they assured him that they could.

Immediately after the contract was executed on April 28, 1971, Garlam instructed Explo to begin blasting. Explo, however, did not start until early in June. After the first few blasting shots, Garlam informed Explo that the rock fragments were too large and contrary to the contract specifications. Explo did not challenge Garlam's interpretation of the contract until September 22, 1971, when it stated in a letter to Garlam that the rock-size clause meant "an average maximum" of fifteen inches.

Explo had blasted very little rock of any size by September of 1971 and had received no payments from Garlam for what blasting it had done. Explo retained the law firm of DeGarmo, Liedy, Oles and Morrison of Seattle. They contracted for the services of Arner W. Erickson, a civil engineer, who had considerable experience in highway construction and blasting operations. Erickson came to Puerto Rico on September 5, 1971, to investigate the situation. He met with Garffer of Garlam the next day and inspected the job site.

Erickson's testimony included statements to the following effect: He did not attempt to resolve the controversy over the rock size. He saw blasted rocks ranging in size from six and seven feet down to one foot. Garlam had good reasons for wanting rocks less than fifteen inches in size; the blasted material would be easier to handle and move and it was more suitable for use as fill in the embankment. Large boulders could not be used for fill.

Erickson returned to Seattle before September 11. He advised Explo to replace some of its personnel in Puerto Rico and to increase the amount of equipment it was using. Explo replaced the two men in Puerto Rico in charge of its operations, Teller and Goode, with Messrs. Cronin and Herrera. Cronin and Herrera arrived sometime in late September. Beginning in October, the quantity and quality of the blasting material produced by Explo improved. Garlam had continuously insisted that the rock blasted should not exceed fifteen inches in size, but Explo regularly and consistently exceeded that size.

In the morning of November 3, 1971, Garffer met with Attorney Oles and W.E. Johnson of Explo. Johnson had been hired by Explo to manage all its Puerto Rico jobs [2] from October of 1971 to March, 1972. Oles informed Garffer that, unless its price for mass blasting was raised to .82 cents per cubic yard and its presplitting increased by some negotiated amount, Explo would be forced to leave the project. Garffer told them that he would think it over and give them his decision that afternoon. Garffer told Oles and Johnson in the afternoon of November 3 that he would not renegotiate the contract prices. Oles then informed Garffer orally that Explo terminated the contract. This oral termination was confirmed in a letter dated November 9.

The reason advanced by Explo for its slow progress on the job was that Garlam had no available written work schedule and that Explo, therefore, was unable to properly program its blasting activities. Garlam followed the critical path method in

---

2. Explo had two other jobs in Puerto Rico in addition to the one for Garlam.

scheduling its work. It provided the Highway Authority with its work schedules, which under the prime contract had to be programmed on a weekly and daily schedule. Copies of the critical path schedules were available to Explo in Garlam's construction-site office. One of Garlam's supervisors met daily with Explo and advised it of the work schedule. Explo was also advised of the weekly work schedule that Garlam was following.

Under the contract, there were to be partial payments to Explo for its production at the agreed unit price within ten days after Garlam had been paid by the Highway Authority for that particular work. Garlam made no payments to Explo, although it had received payments from the Highway Authority for work done by Explo. Garlam made no payments to Explo for two reasons. First, it felt that payment was not warranted because of the great number of rocks in excess of fifteen inches. In connection with this, there was some discussion of reducing the payments by fifty percent because of the oversized blasted fragments, but no agreement was reached. The second reason for Garlam's failure to make any payments was that Explo owed it money for the use of Garlam's equipment, personnel, and other services. The amount due Garlam from Explo was greater than any payments due Explo for blasting.

The critical findings of the district court can be stated as follows. Explo "passively" accepted Garlam's interpretation of the rock-size clause in the contract until September 22, 1971. The clause was a composite drafting by both Explo and Garlam with the final language drafted by Attorney Oswald of Explo. "During the six months period that Explo was working on the project, it did not comply with the interpretation of Garlam as to the maximum rock size although Garlam continuously insisted that Explo produce material not exceeding 15 inches in size."

Despite the contract provisions and Garlam's instructions, Explo unnecessarily delayed starting its work and continued to show slow progress in carrying out the blasting. Explo's slowness was not attributable to Garlam which had the right under the contract "to direct the work of Explo from day to day and coordinate Explo's work with its own and that of other subcontractors."

Explo abandoned the contract on November 3, 1971.

### B. Conclusions of Law of the District Court

We turn next to the pertinent conclusions of law of the district court. The conclusions are indented and followed by our comments.

A. The contract is to be interpreted under Puerto Rico law.

There is no dispute as to this.

B. Explo was not a third-party beneficiary of the prime contract and "any alleged violations of the prime contract by Garlam would not justify Explo's failure to perform the subcontract or its abandonment of the project."

■ Explo seems to argue that it had a right of renegotiation because the prime contract provided for equitable renegotiation of unit prices if the actual work quantities differed substantially from the Highway Authority's estimate. There was, however, no such provision in Explo's contract and the district court's ruling was correct. Moreover, there was no evidence before the district court that Explo's production was affected in any way by the work quantity estimates of the Highway Authority. The difficulties between Explo and Garlam stemmed from three factors: oversize rock fragments, low quantity of material blasted, and slow work progress.

C. The subcontract between the parties does not have a termination or rescission clause that will permit Explo to rescind or cancel the subcontract with Garlam.... If Explo is entitled to terminate the agreement ... the authorization to do so is to be found not in the subcontract but in some other source.

This is a correct reading of the contract.

D. It is not necessary to decide whether under Puerto Rico law substantial non-

payment excuses performance because "the evidence fails to establish any substantial non-payment."

This finding of fact is not clearly erroneous.

F. The language contained in the unit price clause is ambiguous and therefore it is necessary to apply the rules of interpretation contained in the Civil Code of Puerto Rico. Title 31 § 3478 of that code reads as follows:

> The interpretation of obscure stipulations of a contract must not favor the party occasioning the obscurity.

The language of the unit price clause was finally drafted by Mr. Hugo E. Oswald, Jr., then general counsel for Explo, in the negotiations of the subcontract. While both Garlam and Explo contributed some of the complicating words, the final drafting was actually done by Mr. Oswald. We conclude as a matter of law that the obscurity of the language must be charged to Explo and that the correct interpretation of the unit price clause is that the material to be produced must be generally within the range of 15 inches or less. We conclude that otherwise Garlam could not comply with other requirements of the prime contract which required it to dispose of the rock fragments to construct compaction layers of approximately 6 inches in the embankments and 24 inches in the rock fills. The interpretation of the clause suggested by Explo creates an absurd situation which this court rejects. Its suggested interpretation is inconsistent with its explicit contractual obligation to blast "secondary boulders that may appear after a blasting operation, if required by the contractor." Therefore, in the determination of the amount of work done by Explo, consideration should be given to the contractual requirement that Explo produce material which finally could not exceed 15 inches as a maximum size and that such other larger boulders had to be broken down by secondary blasting if they exceeded this maximum of 15 inches.

■ Explo objects strenuously to this mixed finding of law and fact. Whether the "obscurity" of the language should be charged to Explo is a close question, but we think that Oswald, as a lawyer, should have been aware that the rock-size clause was ambiguous and thus we agree with the district court that the responsibility for its language lay with him. Even, however, if we accept the clause as a joint production, the evidence establishes that Explo knew and understood that rocks in excess of fifteen inches were to be the exception rather than the rule from the time the contract was being negotiated to its dissolution by Explo on November 3, 1971. Explo's field managers, Teller and Goode, told Garffer during contract negotiations that Explo could produce rocks averaging four to six inches in size. Explo did not urge its version of the meaning of the clause until September 22, 1971. And, after the new personnel arrived on the job in October, the size of the rock fragments diminished appreciably. We interpret the contract provision as did the district court.

G. As a consequence of this breach by Explo, Explo is obligated to pay to Garlam the actual and necessary additional costs reasonably incurred by Garlam in order to complete the work required by Explo by the subcontract. As above indicated, the question whether or not any delay penalty is chargeable against Explo and if so, how much, is to be determined by evidence adduced in the second trial. The question of interest on any amounts credited to or chargeable against Explo is likewise to be determined by evidence adduced at the second trial. All costs of this first trial are taxed against Explo.

This ruling follows logically from the previous ones.

## II. DAMAGES

By stipulation of the parties, the damages issue was referred to a master. The master held a two-day hearing at which a great number of exhibits of considerable size and complexity were introduced. His detailed and extensive report was issued

about six months after the hearing.[3] The master awarded damages to Garlam in the amount of $2,423,177. The findings and rulings of the master were subsequently adopted by the district court.

 We agree with the district court that the master applied the correct legal principles in making his findings, which were supported by the evidence and not clearly erroneous. We rule specifically that Garlam carried its burden of proof on damages. There is no basis in the contract or the evidence for finding that Explo was entitled to an equitable price increase. Nor are we impressed with Explo's argument that Garlam failed to mitigate its damages and, hence, is precluded from recovering. This overlooks the fact that, after Explo breached its contract, Garlam was under time constraints in its prime contract with the Highway Authority to complete the blasting within a comparatively short time.[4] The measure of damages was, as the district court found, "the actual and necessary additional costs reasonably incurred by Garlam in order to complete the work required by Explo by the subcontract." The amount arrived at by the master reflected accurately the application of this damages formula.

## III. THE SUIT IN PUERTO RICO SUPERIOR COURT BY GARLAM AGAINST THE HIGHWAY AUTHORITY

We now turn to Explo's claim that the adjudications in Garlam's Puerto Rico Superior Court suit against the Highway Authority were binding on Garlam and the district court and require a reversal of the judgment against Explo.

Initially we note that we can find nothing in the record to indicate whether the Superior Court judgment, which is dated June 15, 1982, has been appealed. Nor have we found any definitive record of when the Superior Court action was commenced. We will, however, for purposes of our analysis accept Explo's representation that the suit was filed prior to the start of the hearing on damages before the master.

We agree with Explo that a judgment of the Commonwealth court is entitled to full faith and credit by a federal court. We also agree that the collateral estoppel doctrine of issue preclusion would prevent a party from denying or relitigating in federal court issues already decided by the Superior Court of Puerto Rico. The question is whether, under the circumstances here, the rulings and findings of the Superior Court in the case of *Garlam v. The Highway Authority* require a reversal of the judgment in this case. We find that they do not for several reasons.

 The first is a matter of chronology. The Superior Court judgment did not issue until June 6, 1982. It, therefore, postdated the liability verdict of March 30, 1977, in this case by more than five years. It also postdated the master's report of April 29, 1980, by more than two years. And, although the Superior Court judgment did precede the opinion and judgment of the district court of November 16, 1982, adopting the master's findings and rulings, the Superior Court judgment was not called to the district court's attention until November 24, 1982.

Under this chronology, we rule that the Superior Court judgment could have no effect on the liability rulings and findings made in this case. We agree with the district court that Explo's tardy invocation of the Superior Court judgment precludes it from using the judgment for an attack on the damages awarded Garlam. Explo knew about the Superior Court action from at least the date of the hearing before the master on damages, October 29–31, 1979. It questioned and cross-examined Highway Authority witnesses about the Commonwealth court action, referred to the pleadings, and introduced in evidence part of the proceedings in the Superior Court. It is

---

3. The master actually rendered two reports: a preliminary draft dated March 19, 1980, submitted to the parties for their comments and recommendations; and a final report dated April 24 and filed on April 29, 1980.

4. Explo had agreed to do the work by September 22, 1972.

fair to assume that Explo followed the progress of the Superior Court action closely. We think it was inexcusable for Explo to wait until after the district court's opinion and judgment on damages before raising the issue of the effect of the Superior Court case on this litigation. The doctrine of laches applies to such conduct.

We are also troubled by Explo's failure to at least attempt to intervene in the Superior Court action. The comments of the district court are pertinent:

> Explo has not explained either why it never sought intervention in the Commonwealth case or why it did not request joinder of the claim against Garlam for the equitable unit price reduction it could have allegedly derived from Garlam's contract with the PRHA. The record shows that the Superior Court case was known and monitored by Explo throughout the years. Explo continuously referred to the pleadings filed in that case and even submitted part of the Superior Court's record as evidence for the Special Master to consider in his determination of damages. Explo's argument that it was not necessary for it to intervene in the Superior Court action because that case dealt with other matters is self-defeating. The Puerto Rico Rules of Civil Procedure allowed Explo to appear in that action to plead precisely the third-party beneficiary status theory that it has now attempted to introduce in this case. Likewise, it could have joined as a party in the two actions. Instead, it adopted a wait and see attitude and never formally raised this new theory of equitable price reduction in this litigation or in the one before the Superior Court.

■ In addition to the procedural barriers to Explo's attempt to use the Superior Court case to avoid the judgment against it, there are also substantive grounds precluding the application of the doctrine of issue preclusion. We note first that the findings and rulings of the Superior Court do not discuss blasting or Explo's role in the highway construction. The Superior Court found that the Highway Authority

owed Garlam $2,466,316.73 based upon the following specific findings:

| | | |
|---|---|---|
| a) | Deposit of 385,803.71 cubic meters of borrowed material agreed upon at $2.95 per cubic meter (Finding of Fact No. 3) | $1,138,120.94 |
| b) | Difference owed on overcuts and miscellaneous cuts –328,008.20 cubic meters at $.92– (Finding of Fact No. 4) | 294,497.54 |
| c) | Asphalt provided—553.645 tons at $25.88 (Fact No. 5) | 46,305.57 |
| d) | Compacted material—2,196,093.62 cubic meters at $.30, less $7,274.43 granted by summary judgment of March 12/78 (Fact No. 6) | 651,553.66 |
| e) | Excavation of material for benchings 137,794.92 cubic meters at $2.03—(Fact No. 7) | 279,722.67 |
| f) | Commercial profit and administrative expenses on work performed through force account (Fact No. 8) | 56,206.35 |
| | Total to be paid | $2,466,316.73 |

Explo's argument can best be stated in its own words:

> In Superior Court, Garlam blamed the owner for cost overruns and collected millions of dollars based (in part) on faulty design. Meanwhile, in federal court, Garlam charged Explo for the entire cost overrun on rock blasting and denied that design errors existed. Garlam refused to credit Explo with the same kind of equitable price adjustment which Garlam obtained for part of its own work from the owner. In short, Garlam wants Explo to reimburse costs which the Superior Court has attributed to the Highway Authority.

Explo's Brief for Nos. 1303 and 1650 at 46. This is a misreading of both the Superior Court decision and the master's findings and rulings on damages. The Superior Court based its decision on the prime contract between the Highway Authority and Garlam in light of subsequent events that related to those two parties alone: the Highway Authority's issuing of thirty extra work orders and nine change orders; its failure to pay Garlam the agreed price for excavating, moving, and depositing of borrowed material; and its failure to pay Garlam anything for certain work items performed. The basis of the master's decision on damages was the extra cost incurred by Garlam due to Explo's breach of its blasting contract. These were two separate lawsuits and the issues in both were

different. In short, there can be no issue preclusion because there is no identity of issues in the two cases.

In this connection, we point out that if Garlam were recovering twice for the same items of work, it would have been to the Highway Authority's advantage to invoke the doctrine of collateral estoppel as to those items for which Garlam was seeking recovery against both Explo in federal court and the Highway Authority in the Superior Court. The Highway Authority was fully aware of the suit by Explo and Garlam's counterclaim. The Authority's resident engineer testified at the federal trial on liability and the general counsel for the Department of Public Works testified at the federal trial on damages and introduced excerpts from the Superior Court trial. Although the Highway Authority might possibly have overlooked some double pay items, it does not seem likely.

For all the foregoing reasons, we rule that the doctrine of collateral estoppel cannot be invoked in this case and that the rulings and findings of the Superior Court case have no effect on the judgment rendered in the case before us.

## IV. INTEREST COMPUTATION

On May 19, 1986, the district court ordered that interest on damages be computed pursuant to 28 U.S.C. § 1961 from November 16, 1982, the date of the court's judgment awarding damages to Garlam. Explo appeals the date of interest accrual, arguing that interest should only be awarded from March 6, 1986, the date of the district court's judgment after which these appeals were filed.

### A. *Procedural History*

The case was brought in the United States District Court on January 3, 1972. On November 28, 1979, Garlam appealed from the dismissal of its third-party complaint against Rockor. On December 10, 1979, this court stated: "Since it does not appear on the papers before us that the

district court certified this dismissal as final pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, we lack jurisdiction over this appeal." On November 16, 1982, the district court entered a judgment against Explo on its complaint and for Garlam on its counterclaim. On March 15, 1983, Explo filed a notice of appeal. On May 9, 1983, this court dismissed the appeal holding: "It appearing that the notice of appeal was filed while a motion to substitute parties was pending, we view the judgment below as not a final judgment." On August 16, 1985, Garlam filed a notice of appeal from the judgment of November 16, 1982,[5] and the district court's order of August 8, 1975, denying Garlam's motion to substitute Rockor for Explo. On August 26, 1985, the district court granted Explo's motion to have the proceedings continue in that court because Explo had a pending motion for postjudgment relief. On October 10, 1985, this court dismissed Garlam's appeal. The memorandum and order reads:

In 1983, *Garlam* Enterprises Corporation ("Garlam") *argued* to this court *that an order entered by the district court in November, 1982, was not a final order* because it did not adjudicate all of the claims against all of the parties. This court agreed, noted that proceedings were still pending in the district courts [sic], and dismissed without prejudice an appeal filed by Explosives Corporation of America ("Explo").

Now, Garlam argues to this court that the November 1982 order was a final judgment, and that a Motion for Reconsideration filed recently by Explo is therefore untimely. This court's prior order, however, reflects the law of the case and is binding precedent upon Garlam at this stage of the litigation. *United States v. DeJesus*, 752 F.2d 640, 642 (1st Cir.1985) (*per curiam*).

Alternatively, Garlam requests that this court take jurisdiction over this appeal even though a motion for post-judg-

---

5. Garlam appealed from the denial of prejudgment interest, costs and attorney's fees, and the order to pay one-half of the master's fees.

ment relief is pending in the district court. We decline to do so for two reasons. *First, it appears that no final judgment has been entered in this matter.* Adjudication of Garlam's motion for substitution of parties in and of itself does not constitute entry of a final judgment. *See* Fed.R.Civ.P. 58.[1] Second, the instant notice of appeal is, in any event, premature because of Explo's pending motion for post-judgment relief. That motion tolls the running of the appeal period. F.R.A.P. 4(a)(4). The district court explained this to Garlam, and informed Garlam that it should file a new notice of appeal after that court ruled on Explo's motion.

The appeal is dismissed for lack of jurisdiction, without prejudice to timely filing of new notices of appeal. [Emphasis added.]

[1] We draw this to the attention of the parties and the district court so that this matter can be clarified or corrected without causing the parties further unnecessary delay.

On March 6, 1986, the district court entered an order that was "[f]or purposes of an appeal ... a Final Judgment." On March 24, 1986, Explo filed a notice of appeal, and on March 31, 1986, Garlam followed suit. It is from these notices that the current appeals stem.

On May 19, 1986, the district court decided that interest should run from the date of its judgment issued November 16, 1982. It based its ruling on the fact that using the date of its March 6, 1986, judgment would "deprive Garlam of its statutory right to obtain interest on the November 16, 1982, judgment [and] would defeat the purposes of [28 U.S.C.] section 1961." The court stated that it had followed the requirements of Rules 58 and 79(a) of the Federal Rules of Civil Procedure for making its November 16, 1982, judgment final with respect to interest accruing, even if the same judgment was not "final" for the purposes of appeal.

### B. *The Date for Accruing Interest*

■ "Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the *date of the entry of the judgment.*" 28 U.S.C. § 1961 (Supp. 1987) (emphasis added).

A judgment "includes a decree and any order from which an appeal lies." Fed.R. Civ.P. 54(a). It is clear from this court's prior dismissals that the November 1982 judgment was not final because other issues remained to be resolved.

The district court never made a Rule 54(b)[6] determination as to the November 1982, judgment nor did Garlam ask for one. Moreover, the district court's order of August 8, 1985—allowing the proceedings to continue in that court despite a pending notice of appeal—suggests that the judgment of November 16, 1982, was not intended to be final.

There is merit to the district court's opinion on interest and there is precedent for awarding interest from the date of judgment on liability and damages. *See Turner v. Japan Lines, Ltd.,* 702 F.2d 752 (9th Cir.1983), which held that interest should be computed from the initial assessment of damages where there was a delay between that date and the date of entry of final judgment. *Turner* expressly rejected the holding in *Hooks v. Washington Sheraton Corp.,* 642 F.2d 614, 616 (D.C.Cir.1980), which confined the application of 28 U.S.C.

**6.** Federal Rule of Civil Procedure 54(b) provides:

> **(b) Judgment Upon Multiple Claims or Involving Multiple Parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express di-

> rection for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

§ 1961 to a final judgment as defined in Rule 54(b). For several reasons, we believe it would be inappropriate to allow postjudgment interest to begin running before entry of final judgment in this case.

First, Garlam never sought a Rule 54(b) determination even though it had been alerted to the problem by our order of December 10, 1979. Second, Garlam argued that the November 16, 1982, judgment was not final when Explo attempted to appeal the liability part of the judgment. If the judgment was not final for liability purposes, it could not be final on damages. Third, we dismissed appeals on December 10, 1979, May 9, 1983, and October 10, 1985, on the same grounds: that there was no final judgment from which an appeal could be taken. We do not deem it advisable at this stage of the proceedings to decide that final judgment meant one thing for appeal and another for the computation of interest. It is, of course, not without significance that the district court failed to make a Rule 54(b) determination as to its judgment of November 16, 1982.

For the foregoing reasons, interest pursuant to 28 U.S.C. § 1961 must be recomputed starting March 6, 1986.

## V. THE SUBSTITUTION ISSUE

■ Garlam appeals the denial of its motion to amend the pleadings so as to add Rockor, Inc. (Rockor), as a defendant to its counterclaim and the denial of its motion to substitute Rockor for Explo. Since we conclude that substitution should have been allowed, we focus on that.

Federal Rule of Civil Procedure 25(c) provides in pertinent part:

(c) **Transfer of Interest.** In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

The basic question is whether Rockor should be held liable for the damages awarded Garlam against Explo. Despite the fact that Explo's interest in the lawsuit was transferred to Rockor, the district court decided against substitution on the ground that liability should not be imposed on Rockor for the debts of its predecessor. We recognize that a substitution decision is within the discretion of the district court but find that its legal analysis was erroneous.

The resolution of this issue turns on the relationship between Rockor, Explo, and Excoa, a corporation with which Explo merged, and Rockor's role in the litigation. The record on this issue consists of stipulated exhibits and the deposition of George S. Sutherland, chairman of the board of Rockor. There is no dispute over the facts, only the conclusions to be drawn from them. In 1959, Rocket Research Corporation (Rockor)[7] was incorporated in the State of Washington for the research, development, and manufacture of rocket engines and propellants. Sutherland started working for Rockor in 1960 and became its chief executive officer. In May 1966, Explosives Corporation of America (Explo) was incorporated to research, develop, and manufacture explosives. Rockor was Explo's sole stockholder; it owed 92% of the stock. Sutherland became chairman of the board of Explo. One of Explo's requirements under its contract with Garlam was that it obtain a surety and performance bond in the amount of 1.2 million dollars. The bond was obtained from the General Insurance Company of America after Rockor agreed to indemnify the bonding company if Explo failed to perform. Rockor had full knowledge of the lawsuit since it started; it filed yearly status reports on the litigation with the S.E.C.

In early 1973, Excoa, Inc., was incorporated for manufacturing explosives and chemicals. Rockor was the sole stockholder and owner of Excoa and Sutherland was chairman of Excoa's board of directors from its formation until its dissolution. Explo was merged into Excoa on April 27, 1973, with Excoa assuming all of Explo's debts and liabilities. One of the purposes of the merger was to increase Rockor's

7. On March 15, 1977, Rocket Research Corporation changed its name to Rockor, Inc.

ownership of Explo's stock from 92% to 100%. On October 29, 1976, Rockor, as the principal creditor of Excoa, took over most of Excoa's assets; Excoa owed Rockor approximately $5,600,000. The bill of sale from Excoa to Rockor included all of Excoa's interest in the lawsuit between Explo and Garlam. There was no limitation on the extent of Rockor's participation in the lawsuit. Excoa was subsequently dissolved for tax purposes and not for any reason connected with the litigation. Attorney Oles has represented Explo, Excoa, Rockor, and the General Insurance Company (bonding company) since the start of the lawsuit. Since at least 1976, Rockor has financed the litigation directly.

It can be fairly inferred from the foregoing facts that Rockor has controlled the litigation at least since it took over Excoa's assets on October 29, 1976.

The pertinent procedural history of the substitution issue must also be recounted. On September 9, 1977, after the liability judgment but before the hearing and award in damages, Garlam moved to substitute Rockor for Explo. This motion was never ruled on directly. Apparently at the suggestion of the court, Garlam filed a motion on November 10, 1977, asking that Rockor be added as a defendant to the counterclaim. On November 6, 1982, former Chief Judge Pesquera reversed a prior ruling he had made and denied the motion for lack of *in personam* jurisdiction over Rockor. Judge Cerezo reaffirmed the jurisdictional dismissal of Rockor as an additional party but stated that she would consider a motion for substitution under Federal Rule of Civil Procedure 25(c). Such a motion was filed by Garlam on December 15, 1982. On August 7, 1985, the district court denied the motion to substitute Rockor for Explo.

The district court's opinion focuses on the fact that Rockor was a separate entity from Explo-Excoa and that Rockor did not assume Explo-Excoa's liabilities. The cases on which it relied involved the question of whether a successor corporation could be sued in the first instance and held liable for the acts or failure to act of its predecessor. With due respect, we think that the court's focus was misdirected; it should have been on the relationship between Rockor and Explo-Excoa and the role Rockor played in the litigation.

In *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), the Court discussed the effect of the related doctrines of collateral estoppel and res judicata on a nonparty who controls the litigation. It held that the interests advanced by these doctrines "are similarly implicated when nonparties assume control over litigation in which they have a direct financial or proprietary interest and then seek to redetermine issues previously resolved." *Id.* at 154, 99 S.Ct. at 974. The Court then quoted *Souffront v. Compagnie des Sucries*, 217 U.S. 475, 486–87, 30 S.Ct. 608, 612, 54 L.Ed. 846 (1910):

> "[O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own ... is as much bound ... as he would be if he had been a party to the record."

We recently applied this principle to hold the two shareholders of a corporation, who were officers and members of the board of directors, liable for unpaid contributions of the corporation to an employee benefits plan. *Alman v. Danin*, 801 F.2d 1 (1st Cir.1986). We stressed that the individuals "held ultimate and complete control over the litigation strategy the now defunct corporation pursued" and that "both men had an economic stake in the outcome of the trial and were, of course, in a position to know everything that occurred." *Id.* at 5. Rocker was in essentially the same position vis-a-vis Explo-Excoa as were the two shareholders in *Alman* and, like them, had complete control over the litigation. We realize that in *Alman* the action was brought directly against the individuals and the question of substitution under Rule 25(c) was not involved.

The underlying legal principle that a participating nonparty is bound by the judgment does not, however, depend upon the procedural stance of the case. In *Panther*

*Pumps & Equipment Co., Inc. v. Hydrocraft, Inc.*, 566 F.2d 8 (7th Cir.1977), *cert. denied sub nom. Beck v. Morrison Pump Co., Inc.*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978), the Court held that Rule 25(c) could be invoked to substitute a successor in interest who had obtained the assets of the corporation against whom judgment had been rendered. It defined successor as "one who succeeds or takes the place of another." *Id.* at 24. It quoted Moore's Federal Practice:

> Rule 25 has application only to actions pending in the district courts. But this should not preclude substitution after judgment has been rendered in the district court * * * for the purpose of subsequent proceedings to enforce * * * * a judgment. [3B Moore's Federal Practice ¶ 25.03[1], at 25–101 (2d ed. 1977), footnote omitted]

*Id.* at 23. The facts in *Minnesota Mining and Manufacturing Company v. Eco Chem, Inc.*, 757 F.2d 1256 (Fed. Cir.1985), have some similarity to the facts in the instant case. Suit was brought by 3M against Eco Chem, Inc., a corporation owned and controlled by Stephanie and George Rynne. A default judgment was obtained against Eco Chem. After suit had been commenced, the Rynnes formed a Georgia corporation, ECL, and the shareholders of Eco Chem exchanged their stock for ECL shares and all of Eco Chem's assets were transferred to ECL, making Eco Chem completely judgment proof. The court found that ECL was properly joined as a party "because it succeeded to the assets from which 3M may satisfy its judgment." *Id.* at 1264.

It has long been the rule that a nonparty who controls the litigation is bound by the judgment. "The reason would be that the non-party would have the power to determine what evidence and arguments should be offered in the litigation and, if appropriate, the appeal." *General Foods Corporation v. Massachusetts Department of Public Health*, 648 F.2d 784, 789 (1st Cir.1981). *See also Drier v. Tarpon Oil Company*, 522 F.2d 199 (5th Cir.1975) (president of corporation held liable because of privity and as a controlling person under 15 U.S.C.

§ 77o); *Kreager v. General Electric Company*, 497 F.2d 468, 471 (2d Cir.) (sole shareholder of corporation bound by dismissal of first action brought in the name of his corporation), *cert. denied*, 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974); *Pan American Match, Inc. v. Sears, Roebuck & Co.*, 454 F.2d 871, 874 (1st Cir.) (subsidiary corporation sufficiently identified with its parent company to represent the legal rights of the parent), *cert. denied*, 409 U.S. 892, 93 S.Ct. 113, 34 L.Ed.2d 149 (1972); 1B J. Moore, J. Lucas, & T. Currier, *Moore's Federal Practice and Procedure* § 0.411[10] at 477–78 (1984 & Supp.1986–87).

■ We agree with the district court that there is no problem of *in personam* jurisdiction. There are two reasons. First, once *in personam* jurisdiction has been found over the original party, it exists over the substituted party despite its lack of contacts with the forum if the substituted party had an opportunity to challenge its joinder or substitution. *Minnesota Min. & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d at 1262–63. *See* 7C C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1958 at 559–60 (2d ed. 1986). Here, Rockor controlled Explo's successful challenge to the substitution motion.

The second reason is that the minimum contacts necessary for *in personam* jurisdiction were intertwined with Rockor's role in the litigation. "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.' *Shaffer v. Heitner*, 433 U.S. 186, 204, [97 S.Ct. 2569, 2579, 53 L.Ed.2d 683] (1977)." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984). When substitution was first sought, Rockor had succeeded to Explo-Excoa's interest in the suit, was financing the litigation and had agreed to indemnify the bonding company in the event of a judgment against Explo. Because it availed itself of Puerto Rico as the forum in the hope of obtaining a judgment that would inure to its benefit and was obviously aware of the nature and progress of the case, Rockor

had sufficient contacts with Puerto Rico to meet the fourteenth amendment due process requirements. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. at 775–76, 104 S.Ct. at 1478–79.

There can be little doubt that, at least from the time it acquired Explo-Excoa's interest in the lawsuit, Rockor was the real party in interest. Federal Rule of Civil Procedure 17(a) requires that "[e]very action shall be prosecuted in the name of the real party in interest." Rule 25(c) is, in effect, the continuation of Rule 17.

> Subdivision (c) of Rule 25 deals with transfers of interest during the course of the action. The situation with which it is concerned may be compared and contrasted to that obtaining where a transfer of interest such as by an assignment takes place *prior* to the commencement of the action. In the latter situation Rule 17 controls and requires that the action shall be prosecuted in the name of the real party. But where the transfer of interest takes place *during the course of the action*, Rule 25(c) controls and provides that the action may be continued by or against the original party whose interest has been transferred, unless the court, upon motion, directs that the person to whom the interest has been transferred be substituted in the action, or joined with the original party.

3B J. Moore, & J. Kennedy, *Moore's Federal Practice* § 25.08 at 25–77, 78 (1987) (footnotes omitted). Substitution may be ordered after judgment has been rendered in the district court for the purpose of subsequent proceedings to enforce judgment. *Id.* § 25.03 at 25–27.

In addition to Rockor's ownership of Explo-Excoa and its financing and control of the litigation, there is another reason why Rockor is liable for the amount of the judgment against Explo. The contract between Explo and Garlam contained the following clause: "It is mutually agreed that this Agreement shall bind the heirs, executors, administrators, successors, holding companies and assigns of the parties hereto." It cannot be doubted that Rockor was a successor to Explo. It also is evident

that Rockor, which owned all of the outstanding stock of Explo at the commencement of the action, was a holding company of Explo at the time the contract was executed.

For the following reasons, we hold that Rockor is liable for the full amount of the judgment against Explo and must be substituted for Explo as the defendant to Garlam's counterclaim: Rockor from the beginning was the controlling stockholder of Explo-Excoa; it succeeded to Explo-Excoa's interest in the lawsuit; after the merger of Explo into Excoa and Excoa's dissolution, Rockor became the real party in interest, indeed the only party in interest; Rockor financed and controlled the litigation; and Rockor is bound under the contract between Explo and Garlam as Explo's successor and a holding company of Explo.

Under these facts and the applicable legal principles, Rockor could not limit its litigation liability to the amount for which it agreed to indemnify the bonding company. Litigation is a two-way street. Once it is entered it must be travelled the full length; except for settlement or bankruptcy, there is no escape route. If Garlam had been found liable, the full amount of the judgment would have gone directly to Rockor. It, therefore, must pay the full amount of the judgment against Explo.

## VI. GARLAM'S APPEAL ON ATTORNEY'S FEES, COSTS, AND PREJUDGMENT INTEREST

In its opinion adopting the master's report on damages, the district court found "that Explo has not conducted the litigation in an obstinate manner and that imposition of pre-judgment interest, costs and attorney's fees is not justified." This decision was within the discretion of the district court and we find no reason for disturbing it.

## SUMMARY

We affirm the judgment of the district court on liability and damages. We reverse the order of the district court as to the date from which interest shall be computed. We reverse the order of the district

court on the motion for substitution and order that Rockor be substituted for Explo as defendant to the counterclaim. We affirm the order of the district court denying Garlam attorney's fees, costs, and prejudgment interest.

*Affirmed in part, reversed in part, remanded.*

Costs awarded to Garlam on these appeals.