21 F.3d 1111
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Harley B. BLANKENSHIP, Plaintiff-Appellant,
v.
OMNI CATERING, INC., dba Movieland Caterers, Defendant,
and
Vito P. Minerva, Defendant-Appellee.
 No. 92-55871.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 6, 1993.
Decided April 1, 1994.
 
 Before: FLETCHER and D.W. NELSON, Circuit Judges, and WILL,* District Judge.
 MEMORANDUM**
 Plaintiff-Appellant Harley L. Blankenship, administrator and assignee of the Motion Picture Health and Welfare Fund and Pension Plan (the "trust funds") brought an action against defendant Vito P. Minerva, President of the now-defunct Omni Catering, Inc., alleging violations of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1001, and Sec. 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. Sec. 186. Blankenship sought to hold Minerva personally liable for over $200,000 owed by Omni to the trust funds in unpaid contributions, interest, and liquidated damages. Following a bench trial, the district court refused to pierce the corporate veil to hold Minerva personally liable for Omni's contractual and statutory obligations to the trust funds, and Blankenship brought this appeal. Jurisdiction is proper pursuant to 28 U.S.C. Sec. 1331 because this action arises under federal law. We affirm.
 I.
 BACKGROUND
 Omni Catering Inc. ("Omni"), a California corporation, was a food catering business which primarily served the motion picture industry. The company was founded on April 26, 1984 by defendant Minerva and his friends Robert Daley and Phil Pantaleo. Each of the three initial investors purchased 1000 shares of Omni stock for $1000, and each owned a one-third interest in the corporation. Of these three initial investors, only Pantaleo, a chef, had experience in the catering industry. Under their agreement, Minerva served as Omni's President and Daley and Pantaleo as Vice Presidents. In addition to his $1000 stock purchase, Minerva lent the corporation an additional $25,000-30,000 to enable it to purchase two catering trucks. Excerpts of Record ("E.R.") at 22-23.
 Within a few months, Alan Stearns and Mark McKenna, both having considerable experience in the catering industry, joined the business. Stearns purchased 1000 shares of stock for $1000, and McKenna later joined the company as an equal owner for $10,000. Each shareholder thus had a 20% ownership interest in Omni. E.R. at 24.
 Upon the advice of Stearns, the shareholders agreed that Omni should recognize and contract with at least one union. Minerva executed agreements with the union's trust funds. E.R. at 25. Minerva made further periodic undocumented loans to enable Omni to meet its expenses during periods of financial difficulty. E.R. at 27, 96.
 Shortly after Stearns and McKenna joined Omni, Daley and Pantaleo decided to sell their respective shares in the corporation. In 1985, Omni paid Daley $40,000 for his shares; in 1986 or 1987, it paid Pantaleo $63,000 for his shares. These payments were recorded as purchases of treasury stock on Omni's corporate tax returns. Supplemental Excerpts of Record ("S.E.R.") at 15, 38. Stearns, McKenna, and Minerva then each owned a one-third interest in Omni. For approximately the next five years, Stearns and McKenna managed the daily operations of the business, while Minerva acted as an investor. When Stearns left Omni in April 1989, Omni purchased his shares for nearly $100,000. E.R. at 27-28.
 In 1987, Omni hired Ray File as a bookkeeper. E.R. at 27, 33. File learned that Minerva had loaned between $130,000 and $150,000 to Omni to meet its operating expenses. These loans had never been documented or repaid. Accordingly, File implemented a repayment schedule, whereby Omni would begin paying Minerva $1000 per week. Br. of Appellant at 8.
 When it became apparent that Omni would not be able to make these payments and meet its other obligations, Minerva instructed File to pay Omni's other debts first, and make the weekly payments to him only if available funds remained. Consequently, Omni did not repay Minerva on a regular basis from 1987 until April 1990. E.R. at 31.
 From July 1987 until early 1990, the trust funds began notifying Omni that it was not making timely fringe benefit payments on behalf of those employees covered under the union agreement. E.R. at 355-68. On August 25, 1989, the trust funds informed Omni that they would seek to audit the corporation for the time period from January 1985 forward. The audit took place in October 1989.
 It is undisputed that Omni's personnel--including Minerva--did not know that they were improperly completing the union forms for fringe benefit contributions. Omni erroneously failed to report the hours of non-union employees; instead, it reported only the hours spent by union employees on union work. Omni did not learn until after the audit that it was additionally required to report the hours of employees who had refused to join the union. As a result of this mistake, Omni paid the following percentages of total employee benefit contributions owed to the trust funds: 69% in 1985; 36.6% in 1986; 31.1% in 1987; 21.4% in 1988, 20.5% in 1989. Br. of Appellant at 10.
 On April 5, 1990, the trust funds informed Omni that the corporation owed them a significant amount of money for the unpaid fringe benefit contributions. Though Omni suggested that the audit results were inaccurate, the corporation did not submit any documentation to this effect. Br. of Appellant at 10. The trust funds published their audit on May 15, 1990 and announced that, for the time period from 9/1/85 to 6/24/89, Omni owed over $217,000 in delinquent contributions, approximately $45,000 and $21,000 in interest and liquidated damages respectively, and audit fees in the amount of $4500. The trust funds afforded Omni 30 days to offer written comments, yet apparently none were received. Br. of Appellant at 10.
 Around this time, Omni resumed its payments to Minerva for his loans to the corporation. Minerva received weekly payments of $1000 during the month of April 1990. On May 6, 1990, Minerva received $2204. On May 13 and 20, 1990 Minerva received payments of $1000. Throughout the months of June and July 1990, Minerva received eight weekly payments of $1000. On September 9, 1990, Omni paid Minerva $3000. Finally, on April 20, 1991, Omni paid Minerva $2000. E.R. at 207-08.
 Upon the advice of Minerva's attorney, Minerva and Omni signed a financing statement in September 1990, giving Minerva a security interest in all of Omni's assets in consideration for Minerva's loans to the corporation. E.R. at 199. Because he was spending a significant amount of time winding up the business, Minerva began receiving salary payments of $1000 per week in early 1991. The payments continued for approximately eleven weeks. To summarize, over the course of Omni's seven year existence, Minerva received approximately $16,000 in salary payments. At the time Omni went out of business on May 1, 1991, the corporation still owed Minerva approximately $89,000. E.R. at 7.
 After settlement negotiations proved unsuccessful, the trust funds brought an action against Minerva and Omni on March 26, 1991. The trust funds alleged violations of Sec. 502 of ERISA, and Sec. 301(a) of the LMRA, seeking damages for breach of contract and statutory penalties provided under ERISA. The trust funds sought to pierce the corporate veil in order to hold Minerva personally liable for Omni's statutory and contractual obligations. After a trial to the bench, the district court found that Plaintiff had failed to prove a sufficient lack of corporate identity, injustice, or fraudulent intent to justify piercing the corporate veil. Accordingly, the court entered judgment in favor of Minerva. In the action brought against Omni, the district court entered judgment in favor of the trust funds in the amount of $364,446.11.
 The trust funds have appealed the district court's determination that Minerva was not personally liable for Omni's obligations, arguing inter alia that Omni was inadequately capitalized, and that Minerva intentionally misused the corporate form to ensure that his loans would be repaid. Minerva has asked this Court to award damages and sanctions against the trust funds, arguing that their appeal is frivolous.
 II.
 ANALYSIS
 A. Standard of Review and Applicable Law
 The district court's factual finding that Omni's corporate shield was adequate to protect Minerva from personal liability is subject to review under the clearly erroneous standard. See Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., 736 F.2d 516, 523 (9th Cir.1984). The district court's application of the three-factor test to determine whether to pierce the corporate veil is subject to de novo review. See Board of Trustees v. Valley Cabinet & Mfg. Co., 877 F.2d 769, 772 (9th Cir.1989). Though this Court may look to state law for guidance in considering whether to disregard the corporate form, we apply federal substantive law. Id.
 B. Piercing the Corporate Veil
 The district court properly applied the test established by this Court in Seymour v. Hull & Moreland Engineering, Inc., 605 F.2d 1105 (9th Cir.1979), to determine that Minerva was not personally liable for Omni's obligations to the trust funds. To determine whether the corporate veil should be pierced, three factors are of primary importance: (1) the degree to which the shareholders respected the separate identity of the corporation; (2) the degree to which injustice to the litigants would result were the corporate identity recognized; and (3) the fraudulent intent of the incorporators. Id. at 1111. The Seymour test has been consistently applied in this Circuit. See, e.g., Audit Servs., Inc. v. Rolfson, 641 F.2d 757, 764 (9th Cir.1981); Operating Eng's Pension Trust v. Reed, 726 F.2d 513, 515 (9th Cir.1984); Valley Cabinet & Mfg. Co., 877 F.2d at 772.
 The trust funds have urged this Court to adopt a less rigorous standard for disregard of the corporate form in actions brought under ERISA. To support this assertion, Plaintiff relies on a suggestion by the First Circuit in Alman v. Danin, 801 F.2d 1, 3-4 (1st Cir.1986), that extreme deference to the corporate form may be contrary to Congress' intent to protect plan participants deprived of anticipated benefits. Id. at 4 (stating that "ERISA ... cannot be said to attach great weight to the corporate form. Indeed, deferring too readily to the corporate identity may run contrary to the explicit purposes of the Act"). In that case, the First Circuit nonetheless applied the three-factor test, piercing the corporate veil upon finding ample evidence of lack of respect for the corporate form, bad faith, and inadequate capitalization. Id. The three-factor Seymour test may arguably be more favorable to those who wish to pierce the veil than is the "alter ego" test as it is stringently applied in Massachusetts, and the language of the First Circuit upon which Plaintiff relies may reflect that fact. For this reason, the First Circuit has continued to apply the three-factor test in ERISA cases. See, e.g. United Elec. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1092 (1st Cir.1992) (applying the three-factor federal common law test because "disregarding the corporate form is permissible [under state law] only in rare situations.").
 In addition to the Ninth and First Circuits, at least three other circuits have adopted the Seymour test. See, e.g., NLRB v. Fullerton Transfer & Storage Ltd., 910 F.2d 331, 340 (6th Cir.1990) (applying three-factor analysis); Lumpkin v. Envirodyne Indus., 933 F.2d 449, 461 (7th Cir.) (same), cert. denied, 112 S.Ct. 373 (1991); Contractors, Laborers, Teamsters & Eng's v. Hroch, 757 F.2d 184, 190 (8th Cir.1985) (same). Most recently, the Tenth Circuit, relying on the Seymour analysis, adopted an equivalent two-pronged test. NLRB v. Greater Kansas City Roofing Co., 2 F.3d 1047, 1055 (10th Cir.1993). The Tenth Circuit test considers (1) lack of respect for the corporate entity and (2) fraudulent intent or injustice. Comparing its test to that of Seymour, the court stated, "we do not find the difference to be very significant." Id. Thus, in the present case, the district court correctly determined that the Seymour test was applicable to the facts of this case. Accordingly, we must next consider whether the district court's finding that Omni's corporate shield adequately protected Minerva from liability was clearly erroneous. Valley Cabinet & Mfg. Co., 877 F.2d at 772.
 1. Respect for the Corporate Identity
 In Valley Cabinet & Mfg. Co., we agreed that respect for the separate identity of the corporation had been shown where the corporation was adequately capitalized, shares of common stock were issued, board of directors meetings were held, and federal and state taxes were paid. 877 F.2d at 772. The district court correctly found that Minerva respected the separate corporate identity of Omni. Omni was adequately capitalized at its inception and during the course of its existence: the corporation owned eight large catering trucks, purchased large quantities of food for its business, and employed approximately 80 people. Plaintiff concedes that the record offers little evidence of commingling of assets, recognized by this Circuit as "among the more serious abuses of the corporate identity." Id. at 773. In fact, other than the joint ownership of one truck by Minerva and Omni, there is no evidence of any commingling. Omni remained in business for more than seven years, during which time it experienced sales of $12 million and profits of at least $133,000. E.R. at 403. We have previously held that continuing to do business for a period of at least five years indicates a good faith use of the corporate form to conduct a legitimate enterprise. Seymour, 605 F.2d at 1113.
 Moreover, the evidence presented at trial suggests that Omni respected corporate formalities. Omni possessed a corporate checking account and filed corporate and sales tax returns for all relevant years. The corporation filed worker's compensation forms with the state. Stock certificates were issued and board meetings, albeit informal, were held. E.R. at 405-06. Though Omni's reports to the union ultimately proved erroneous, they were filed in a timely fashion.
 The evidence clearly indicates Minerva's lack of business acumen. Though we cannot endorse the inept and uninformed business and record-keeping practices of Defendant and his colleagues, the evidence nonetheless sufficiently supports the district court's finding that Omni's separate corporate identity was respected.
 2. Fraudulent Intent
 The district court did not err in finding that the element of fraudulent intent was not satisfied in this case. Fraudulent intent may be proved in either of two ways: through evidence of fraudulent intent in the formation of the corporation or through evidence of the subsequent misuse of the corporate form to perpetrate a fraud. Valley Cabinet & Mfg. Co., 877 F.2d at 774. Moreover, to justify piercing the corporate veil, there must be evidence of deliberate abuse or misuse of the corporate form in an actual attempt by the shareholders to defraud creditors. Id. at 773 (stating that " 'garden variety' fraud will be insufficient in the absence of shareholder abuse of the corporate form to defraud creditors.").
 The trust funds asserted at oral argument that our recent holding in N.L.R.B. v. O'Neill, 965 F.2d 1522 (9th Cir.1992), cert. denied, 113 S.Ct. 2995 (1993), should dictate the outcome of this case. However, this case and O'Neill are factually dissimilar. In O'Neill, a parent corporation and its majority shareholder created four subsidiaries to take over the operation of a meat plant's closing in an attempt to circumvent the parent corporation's obligation to the unions. The NLRB found the subsidiaries to be "alter egos" of the parent corporation and its majority shareholder and pierced the corporate veil to hold the shareholder liable for a significant back pay award. Id. at 1530. In affirming the NLRB's order, we emphasized that the subsidiary companies were created for the sole purpose of defeating obligations owed under a collective bargaining agreement and the record provided ample evidence to support a finding of alter ego. Id. at 1530.
 By contrast, the record in this case does not lead to an inference of fraudulent intent. Omni was formed nearly six months before the union agreements were executed, and the record indicates that the initial shareholders never contemplated causing the company to enter a union contract until Stearns joined the company. Moreover, the record does not support a finding of subsequent misuse of the corporate form. Minerva lost approximately $89,000 as a result of his involvement with the corporation. E.R. at 411. It is not contested that he received only a minimal salary during the entirety of the corporation's existence. Though Minerva obtained a financing statement and security interest in Omni's assets, he never attempted to enforce the interest to his advantage. E.R. at 7. Minerva testified that, at the time Omni resumed repayment of the loans in April 1990, he was unaware that the corporation owed substantial sums to the union trust funds. This testimony was corroborated by Ray File, Omni's bookkeeper. Assessing their demeanor during the trial, the district court found that both Minerva and File were "credible, truth telling individuals who made honest mistakes." E.R. at 410.
 In Valley Cabinet & Mfg. Co., we refused to disturb the district court's finding that a shareholder did not exhibit fraudulent intent when he transferred more than $203,000 from the corporation to his personal account, where other evidence indicated that the shareholder was unaware of the corporation's obligations to the fund. 877 F.2d at 774. We there noted that "while the transfer of the assets also supports a contrary inference, it was for the trial court to weigh these inferences in making its findings." Id. Though the evidence in this case clearly reveals Minerva's abysmal financial management and sloppy record-keeping practices, it does not clearly indicate an intent to defraud the trust funds, which is an essential element of piercing the corporate veil.
 Plaintiff has argued that Omni's meager profits, its frequent cash flow problems, and the numerous loans it required from Minerva to meet its operating expenses create an inference of fraudulent intent. Because financial setbacks are an unfortunate reality of the business world, we noted in Seymour that "we cannot infer fraud, however, simply on the basis of bad financial times." 605 F.2d at 1105. Thus, because the evidence does not indicate abuse or misuse of the corporate form in an attempt to defraud creditors, the district court did not err in concluding that there was no fraudulent intent.
 3. Degree of Injustice
 The district court also correctly found that the injustice element was not satisfied in this case. Plaintiff has argued that recognition of the corporate form would frustrate congressional intent in enacting ERISA because the debt will remain uncollected. As this Court has previously held in the ERISA context, the "inability to collect [from an insolvent defendant] does not, by itself, constitute an inequitable result." Seymour, 605 F.2d at 1113. Moreover, injustice alone--absent either of the remaining factors--will be insufficient to justify piercing the corporate veil. See Valley Cabinet & Mfg. Co., 877 F.2d at 774.
 
 
 1
 Because the evidence did not satisfy any of the three Seymour factors, the district court did not err when it declined to pierce the corporate veil to hold Minerva personally liable for Omni's debt to the trust funds.
 
 C. Sanctions
 
 2
 Minerva has asked this Court to award sanctions against appellant for the filing of a frivolous appeal. Br. of Appellee at 29-30. Double costs and attorney's fees are permitted for frivolous appeals under Rule 38 of the Federal Rules of Appellate Procedure and 28 U.S.C. Sec. 1912. Rule 38 provides:
 
 
 3
 If a court of Appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellees.
 
 Similarly, 28 U.S.C. Sec. 1212 provides:
 
 4
 Where a judgment is affirmed by ... a Court of Appeals, the court in its discretion may adjudge to the prevailing party just damages for his delay, and single or double costs.
 
 
 5
 An appeal is frivolous when the result is obvious or the appellant's arguments are wholly without merit. NLRB v. Catalina Yachts, 679 F.2d 180 (9th Cir.1992). Though Plaintiff has failed to convince us that the district court's decision was clearly erroneous, this does not lead automatically to the conclusion that the appeal was "wholly without merit." At trial, the district court in fact solicited additional guidance from this Circuit on the issue of fraudulent intent. The court stated:
 
 
 6
 What do you mean Ninth Circuit? Do you mean fraudulent intent must be shown ... or is misuse alone enough? ... I am saying, hopefully constructively, there ought to be a clear exposition of [what] we mean by fraud, and [when] we consider misuse to be fraud.
 
 
 7
 E.R. at 408-09. Given the district court's statements regarding the need for clarification on this point, it cannot be said that the trust funds filed a frivolous appeal in this case.
 
 IV.
 CONCLUSION
 
 8
 For the forgoing reasons, we affirm the district court's ruling that Minerva is not personally liable for Omni's debts to the trust funds. Minerva's request for sanctions is denied.
 
 
 9
 AFFIRMED.
 
 
 
 *
 Honorable Hubert L. Will, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3