**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TRUSTEES OF THE SCREEN ACTORS
GUILD-PRODUCERS PENSION AND
HEALTH PLANS,
　　　　　　*Plaintiff-Appellant,*

　　　　　　v.

NYCA, INC., a California
corporation; TAYLORMADE-ADIDAS
GOLF COMPANY INC., a Delaware
corporation,
　　　　　　*Defendants-Appellees.*

No. 08-55409

D.C. No.
CV-01912-GPS-JC

OPINION

Appeal from the United States District Court
for the Central District of California
George P. Schiavelli, District Judge, Presiding

Argued and Submitted
May 5, 2009—Pasadena, California

Filed July 15, 2009

Before: Alfred T. Goodwin, Diarmuid F. O'Scannlain, and
Susan P. Graber, Circuit Judges.

Opinion by Judge O'Scannlain

8929

**COUNSEL**

Peter S. Dickinson, Bush Gottlieb Singer Lopez Kohanski Adelstein & Dickinson, Glendale, California, argued the cause for the plaintiffs-appellants and filed the briefs. Robert A. Bush and Ira L. Gottlieb, Glendale, California, were on the briefs.

Robert S. Gerber, Sheppard, Mullin, Richter & Hampton LLP, San Diego, California, argued the cause for the defendants-appellees and filed the brief. Matthew W. Holder, San Diego, California, was on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We consider whether the Employee Retirement Income Security Act of 1974 allows employee benefit plans to recover unpaid contributions from an employer who is not a party to the applicable collective bargaining agreement.

I

NYCA, Inc., is an advertising agency based in southern California. Along with other advertising agencies, NYCA is party to a collective bargaining agreement (the "Commercials Contract") with the Screen Actors Guild, a union that represents actors. The Commercials Contract requires signatory advertising agencies, referred to as "producers," to contribute to employee health and pension plans. The producers must pay an amount equal to 14.30 percent of the "gross compensation" paid to "principal performers" for acting in commercials. That is to say, when a performer performs, the agreement requires producers to contribute to the plans.

TaylorMade-Adidas Golf Company, Inc. ("TaylorMade"), manufacturers golf-related products. In 2003, TaylorMade recruited Fred Couples, a famous professional golfer, to endorse its products. Under this lucrative deal, Couples receives a hefty sum for promoting TaylorMade's golf products in television commercials and during personal appearances.[1] The endorsement agreement ensures that, in the event payments under a collective bargaining agreement are necessary, TaylorMade will make the required contributions. Significantly, TaylorMade is not a signatory to the Commercials Contract.

---

[1] Dunlop Slazenger Group Americas originally signed the endorsement with Couples in 2001. In 2003, TaylorMade acquired Dunlop's golf-related assets and liabilities and assumed the agreement. Dunlop is not a party to this appeal.

NYCA and TaylorMade also have their own contractual relationship, which began before TaylorMade signed the endorsement deal with Couples. Under this arrangement, NYCA acts as TaylorMade's exclusive advertising agent for golf-related products and equipment. Under one provision of this agreement, "[TaylorMade] recognize[s] that [NYCA is] signatory to collective bargaining agreements with the Screen Actors Guild and other talent-related union agreements, and that the hiring and use of talent by [NYCA] on [Taylor-Made's] behalf will be subject to the terms of such agreements."

As TaylorMade's advertising agent, NYCA works with Couples to produce golf advertisements. Both TaylorMade and NYCA, however, split the considerable bill for Couples' services. NYCA paid Couples $102,181.50, while Taylor-Made paid Couples significantly more. NYCA, however, calculated its contribution obligations under the Commercials Contract with reference only to its own payments to Couples, instead of the combined payments made by NYCA and TaylorMade. This resulted in a significantly lower obligation than NYCA would otherwise have owed.

Not everyone was happy with NYCA's arithmetic. The trustees of employee benefit plans covered by the Commercials Contract sued both NYCA and TaylorMade. They claimed that the Employee Retirement Income Security Act of 1974 ("ERISA") entitles them to contributions based upon Couples' total compensation, not merely the portion paid by NYCA. The district court dismissed the case for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The trustees timely appealed.

## II

The trustees contend that TaylorMade, which has not signed the Commercials Contract, is nonetheless liable for unpaid contributions as a "joint employer" of Couples.

According to the trustees, "NYCA and TaylorMade jointly exercised sufficient control over Fred Couples' employment such that NYCA and TaylorMade are 'joint employers' for purposes of federal labor law." In support of this theory, the trustees identify analogous cases holding companies liable as "joint employers" under the Fair Labor Standards Act of 1938 ("FLSA").

This argument presents us with a straightforward issue of statutory interpretation. We begin, as we must, with the text of the statute. ERISA requires employers to contribute to employee benefit plans in accordance with the terms of collectively bargained agreements. 29 U.S.C. § 1145. Specifically:

> *Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement* shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

*Id.* (emphasis added).[2] Thus, we must decide whether an alleged "joint employer" who is not a signatory to a collective bargaining agreement may nevertheless qualify as an "employer who is obligated to make contributions" within the meaning of § 1145.

### A

Before reaching that question, however, we pause to satisfy ourselves that we have subject-matter jurisdiction over this

---

[2]An "employer" is defined as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5).

appeal. At the outset, TaylorMade challenges our jurisdiction, asserting that we may not hear this case because TaylorMade is not an "employer who is obligated to make contributions" with the meaning of § 1145. According to TaylorMade, the district court should have dismissed the trustees' action for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) rather than for failure to state a claim under Rule 12(b)(6). The two concepts, of course, are distinct: "the former determines whether the plaintiff has a right to be in the particular court and the latter is an adjudication as to whether a cognizable legal claim has been stated." 5B Wright & Miller, *Federal Practice and Procedure* § 1350 (3d ed. 2004).

**[1]** We disagree with TaylorMade, and take this opportunity to clear up a persistent procedural confusion that has bedeviled the courts of appeals.[3] It is a cardinal principle of federal "arising under" jurisdiction that "[a]ny non-frivolous assertion of a federal claim suffices to establish federal question jurisdiction, even if that claim is later dismissed on the merits." *Cement Masons Health & Welfare Trust Fund for N. Cal. v. Stone*, 197 F.3d 1003, 1008 (9th Cir. 1999); *see also Bell v. Hood*, 327 U.S. 678, 682 (1946) ("If the court . . . exercise[s] its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of

---

[3]*See Bleiler v. Cristwood Constr., Inc.*, 72 F.3d 13, 15 n.1 (2d Cir. 1995); *Xaros v. U.S. Fid. & Guar. Co.*, 820 F.2d 1176, 1180 (11th Cir. 1987). Our own court also has not been immune from this confusion. We have sometimes implied, though never expressly held, that § 1145 is a jurisdictional provision. *See Crotty v. Cook*, 121 F.3d 541, 544 (9th Cir. 1997); *Carpenters S. Cal. Admin. Corp. v. Majestic Hous.*, 743 F.2d 1341, 1345-46 (9th Cir. 1984). But we have also, on occasion, seemed to treat § 1145 as substantive; *see, e.g.*, *Local 159, 342, 343 & 344 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978, 983 n.4 (9th Cir. 1999) ("Section [1145], however, merely creates a cause of action under ERISA for proceeding against an employer who is delinquent in making contributions to a plan. It does not create a separate basis for jurisdiction . . . ."); *Pension Trust Fund for Operating Eng'rs v. Triple A Mach. Shop*, 942 F.2d 1457 (9th Cir. 1991).

the case would be on the merits, not for want of jurisdiction.").

**[2]** Guided by this principle, we clarify today that whether a defendant is an "employer who is obligated to make contributions" within the meaning of 29 U.S.C. § 1145 is a question on the merits of the claim, not an issue of subject-matter jurisdiction. No one suggests that the trustees are attempting to sneak through the courthouse doors on the back of a frivolous federal claim. To the contrary: we are satisfied that the trustees have made out a colorable federal claim that properly belongs in federal court. Whether the trustees will ultimately prevail, of course, remains to be seen. At this stage, however, the district court correctly analyzed this case under Rule 12(b)(6) rather than under Rule 12(b)(1).

B

**[3]** Persuaded that we may decide this case, we return to the merits of the trustees' claims against TaylorMade. We need look no further than the plain language of § 1145 to reach our conclusion. In our view, § 1145 imposes no independent obligation upon employers; it merely provides a federal cause of action to enforce *pre-existing* obligations created by collective bargaining agreements. Indeed, § 1145, though clumsily phrased in the passive voice, nonetheless expressly locates the source of the duties imposed on employers in "the terms of a collectively bargained agreement," not in any independent provision of federal law. Because TaylorMade has not signed the Commercials Contract, it follows that it has not incurred any such pre-existing obligations under § 1145. The trustees' "joint employer" theory, by seeking to impose obligations above and beyond those required by collective bargaining agreements, directly conflicts with the plain language of the statute. Therefore, we decline the invitation to extend the "joint employer" theory to the context now before us.

**[4]** That several other circuits have adopted the same reading of the statutory language supports our conclusion. *See Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 35 F.3d 29, 36-37 (2d Cir. 1994) ("[Section] 1145 does not impose a duty to make pension contributions, even on one who qualifies as an 'employer' under the general definition provided in 29 U.S.C. § 1002(5), if the duty to contribute did not previously exist."); *Mass. Laborers' Health & Welfare Fund v. Starrett Paving Corp.*, 845 F.2d 23, 25 (1st Cir. 1988); *Int'l Bhd. of Painters & Allied Trades Union v. George A. Kracher, Inc.*, 856 F.2d 1546, 1549 (D.C. Cir. 1988) ("ERISA does not require employers to provide pension plans; the obligation to do so, and to contribute to them, springs from a privately-made contract embodied in a plan or a collective bargaining agreement.").[4] Thus, we are satisfied that the trustees cannot hold TaylorMade liable under the "joint employer" theory.

We hasten to point out that an employer may not avoid liability merely by showing that it has not signed the applicable collective bargaining agreement. Shareholders and officers of a corporation may be liable for the company's contribution obligations in situations in which justice requires piercing the corporate veil. *Alman v. Danin*, 801 F.2d 1, 4 (1st Cir. 1986). A non-signatory company may also be liable if the non-signatory is the "alter ego" of the signing company, *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 387 (2d Cir. 1989), if

---

[4]We acknowledge that the "joint employer" theory is recognized under the FLSA. *See Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997). Unlike ERISA, however, the FLSA imposes independent obligations on employers. *See Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 387 (2d Cir. 1989) (stating that the "FLSA commands employers to pay specified wages, whereas ERISA does not require employers to provide pension plans."). In addition, although the FLSA defines the term "employer" in almost the same way as ERISA does, *see* 29 U.S.C. § 203(d), the key language — "who is *obligated* to" — is missing from the FLSA. Thus, even if TaylorMade is an *employer* within the meaning of § 1145, it is not *obligated to* contribute under any plan or collective bargaining agreement.

the two entities are a "single employer," *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 526 (5th Cir. 1982), or if "the interests of the nonsignatory and signatory parties are materially inseparable," *Hotel Employees & Rest. Employees Int'l Union Welfare Fund v. Gentner*, 50 F.3d 719, 722 (9th Cir. 1995).

**[5]** These theories, however, attempt to determine whether the two entities are, in reality, one and the same. If the non-signatory company is really the same as the signatory company, then it is fair to say that the purported non-signatory is actually a signatory, and therefore an "employer who is obligated to make contributions" within the meaning of § 1145. The trustees' "joint employer" theory is completely different. The trustees do not contend that NYCA and TaylorMade have interrelated operations, common management, centralized control of labor relations, or common ownership, as required by the single employer or alter ego theories. Nor do they seek to pierce the corporate veil. Rather, the trustees merely allege that "NYCA and TaylorMade jointly exercised sufficient control over Fred Couples' employment such that NYCA and TaylorMade are 'joint employers' for purposes of federal labor law." This is not enough to show that TaylorMade is "obligated to" contribute within the meaning of § 1145.

**[6]** Accordingly, the district court properly dismissed this cause of action.[5]

### III

The trustees also contend that the Commercials Contract itself obligates NYCA to contribute based upon Couples' total compensation. The trustees assert that the phrase "gross com-

---

[5]The district court held that the allegations in the complaint "do not allege fraud with the specificity required by Rule 9(b)" of the Federal Rules of Civil Procedure. The trustees do not challenge that conclusion on appeal.

pensation," as used in the Commercials Contract, includes all sums paid to Couples under the endorsement agreement. At the very least, the trustees argue, the meaning of the term "gross compensation" is ambiguous and not appropriately determined on a motion to dismiss.

[7] With this argument, the trustees find more solid footing. The key section of the Commercials Contract, section 46.A, obligates "Producers" to "contribute an amount equal to 14.30% *of all gross compensation for services paid to principal performers* as herein defined with respect to television commercials." (emphasis added). It is clear that NYCA, a signatory to the contract, is a producer, and that TaylorMade, a non-signatory, is not a producer. Section 46.A, however, does not expressly limit a producer's contribution obligation to a percentage of the gross compensation *paid by the Producer.* Indeed, Section 46.A does not identify who pays the gross compensation. The plain language of Section 46.A is therefore susceptible to the reading that the trustees urge: that the Commercials Contract measures a producer's contribution obligation by a percentage of the gross compensation paid to principal performers even by entities other than the producer.

NYCA does not dispute that Section 46.A is ambiguous. Instead, NYCA identifies other provisions in the Commercials Contract that it insists "make clear that 'gross compensation' is limited to sums paid to the principal performer by the 'Producer.' " NYCA points first to Section 5.A.1, which provides: "The terms and conditions of this Contract apply to *commercials produced by Producer* in the United States . . . and to commercials for which *Producer engages principal performers*." (emphasis added). NYCA also emphasizes Section 1.A, which provides: "Compensation to principal performers in commercials is based both on *the services which the principal performer renders in the production of such commercials* and on the use which is made of the finished commercial in which the principal performer has rendered services." (emphasis added). According to NYCA, the Commercials Contract

plainly contemplates that "Producers like NYCA (a) engage principal performers to work on commercials, (b) compensate the performers for that work, and (c) make pension and health contributions to the Plans based on that compensation."

We disagree. The contractual passages cited by NYCA establish unambiguously only that the Commercials Contract requires contributions in situations in which the Producer and the principal performer have an employment relationship, i.e., when the "Producer engages principal performers." The provisions do not rule out contributions made by the producer based upon total compensation when a non-signatory is a co-employer of a principal performer. In other words, if NYCA had no relationship whatsoever with Couples, the Commercials Contract would not obligate NYCA to contribute anything.

But that is not the case here. We emphasize that this case involves commercials in which NYCA played a significant part. Indeed, TaylorMade and NYCA worked together to produce the ads that form the basis of this action. The trustees allege that *NYCA* "paid employee Fred Couples [$102,187.50] . . . for the performance of Covered Services on a TaylorMade commercial." If accepted as true, this allegation establishes that the Producer — NYCA — "engage[d]" a "principal performer[ ]" — Couples — in the production of commercials within the meaning of the Commercials Contract. The question whether Couples' "gross compensation" includes sums paid by TaylorMade is not clearly answered.

Nor do the instructions accompanying the contribution form at the end of the Commercials Contract, also emphasized by NYCA, compel a contrary conclusion. Paragraph 6 of those instructions provides: "Only Producers who are *signatory* to an applicable collective bargaining contract of the Screen Actors Guild are eligible to make contributions to the [plans] on behalf of the eligible Performers employed by such Producers." (emphasis added). That paragraph further requires

producers to certify that "all compensation subject to contributions *earned by Performers in our employ* during the period covered has been reported herein." (emphasis added). According to NYCA, those provisions show that "only compensation 'earned . . . in [the] employ' of the signatory Producer is included in the contribution calculation."

Once again, we are unable to say that the contract is unambiguous. The contribution form establishes only that *Producers*, i.e., signatories to the Commercials Contract, are obligated to make contributions. It does not conclusively resolve the issue whether compensation paid to principal performers may include payments made by non-signatories. Like Section 46.A, the contribution form appears to leave that key question unanswered. Paragraph 6 merely refers to "all compensation subject to contributions earned by Performers in our employ." It does not define compensation to mean amounts paid by a producer to a principal performer.

[8] When a collective bargaining agreement is ambiguous, "it is well established that the parties' 'practice, usage and custom' is of significance in interpreting their agreement." *Consol. Rail Corp. v. Ry. Labor Executives Ass'n*, 491 U.S. 299, 311 (1989). Indeed, the interpretation of a collective bargaining agreement "calls into being a new common law—the common law of a particular industry or of a particular plant." *Id.* at 312 (internal citation and quotation marks omitted). Because the district court did not consider such evidence in ruling on NYCA's motion to dismiss, it must, on remand, determine whether the parties' practice, usage and custom—as well as other appropriate aids to interpreting an ambiguous contract—sheds light on the meaning of "gross compensation." Whether the trustees will ultimately prevail, of course, will depend on the extrinsic evidence produced during discovery.

## IV

We turn, lastly, to the trustees' remaining state law causes of action. The trustees attempt to enforce both the endorse-

ment agreement and the NYCA-TaylorMade agreement as purported third-party beneficiaries. They rely on the following language in the NYCA-TaylorMade agreement:

> For all talent engaged or used by [NYCA] on [TaylorMade's] behalf, [TaylorMade] agree[s] to pay [NYCA] the engagement rate approved by [TaylorMade], together with any taxes, pension and welfare fund contributions and other similar payments applicable thereto. [TaylorMade] recognize[s] that [NYCA] [is] signatory to collective bargaining agreements with the Screen Actors Guild and other talent-related union agreements, and that the hiring and use of talent by [NYCA] on [TaylorMade's] behalf will be subject to the terms of such agreements.

The trustees highlight similar language in the endorsement agreement. Notably, the endorsement agreement also specifies that no party is a third-party beneficiary of the agreement.

**[9]** The trustees have not stated a cause of action under California contract law. Under California law, a purported third-party beneficiary must show that the contract was "made expressly for the benefit of a third person." Cal. Civ. Code § 1559. California courts interpret the word "expressly" as the negative of "incidentally." *Spinks v. Equity Residential Briarwood Apts.*, 90 Cal. Rptr. 3d 453, 468 (Ct. App. 2009). Thus: "it is not enough that the third party would incidentally have benefited from performance . . . . The contracting parties must have intended to confer a benefit on the third party." *Id.* (citation and internal quotation marks omitted).

**[10]** The NYCA-TaylorMade agreement plainly protects NYCA, it does not ensure that the plans receive their contributions. Under the agreement's plain language, TaylorMade must indemnify NYCA for required contributions, but is under no affirmative obligation to contribute in the first

instance. The plans "would incidentally have benefited from performance," *id.*, of course, because receiving payments from TaylorMade would make NYCA more likely to fulfill its own obligations. Nevertheless, it is plain that the agreement's reimbursement provisions are expressly for the benefit of NYCA, even though they may incidentally benefit the plans. Similarly, the endorsement agreement is not for the express benefit of the plans, because the agreement is clear that no party is a third-party beneficiary of the agreement.

**[11]** Even if the NYCA-TaylorMade and endorsement agreements were for the plans' benefit, we are persuaded that nothing in either agreement imposes an affirmative obligation on either NYCA or on TaylorMade to contribute. As discussed above, the NYCA-TaylorMade agreement recognizes NYCA's *pre-existing obligation* to the plans by requiring TaylorMade to reimburse NYCA for its pension and health plan contribution obligations when NYCA hires performers on TaylorMade's behalf. *Cf. Transpersonnel, Inc. v. Roadway Express, Inc.*, 422 F.3d 456, 461 (7th Cir. 2005) ("stating that the obligation to *reimburse* for contributions made by another is not the equivalent of an obligation to *contribute* in the first instance."). Similarly, the endorsement agreement, while requiring TaylorMade to contribute directly to the plans in some situations, mandates such contributions only if payment is otherwise required. That qualifier demonstrates that the endorsement agreement, like the TaylorMade-NYCA agreement, recognizes only a *pre-existing* obligation to contribute and does not impose an affirmative duty.

**[12]** Accordingly, the district court properly dismissed the trustees' state law causes of action.

IV

We AFFIRM the district court's grant of summary judgment to NYCA and to TaylorMade on the trustees' second, third and fourth causes of action. We REVERSE the district

court's grant of summary judgment to NYCA on the trustees' first cause of action, and REMAND for further proceedings.

Each party shall bear its own costs on appeal.

AFFIRMED REVERSED and REMANDED